**EXHIBIT K**

**PART 1**

# Advisory Council on California Indian Policy

# Final Reports and Recommendations to the Congress of the United States

## Pursuant to Public Law 102-416

## Executive Summary

## September, 1997

# ACKNOWLEDGEMENT

*The Advisory Council wishes to acknowledge the many California Indians and other individuals who testified at public hearings, participated in the Council's Task Forces, provided documentation, prepared drafts of specific reports, or otherwise supported, encouraged, or contributed to the preparation of these reports.*

# TABLE OF CONTENTS

.................................................................................................................................. 1

I.  Introduction ............................................................................................................ 1

   A.  Creation of the Advisory Council on California Indian Policy ........................................ 2
   B.  Context of the Work of the Advisory Council ............................................................. 2
       1.  A Federal Pattern of Dishonor and Neglect .......................................................... 4
       2.  Federal Awareness of the Situation of the California Indians (1852-1997) ................ 9
       3.  The Time for Decisive Federal Action is *Now* ................................................... 10
   C.  Major Themes of the ACCIP Reports ....................................................................... 10
       1.  The Need to Recast the Federal-Indian Relationship in California ........................... 10
       2.  The Need to Formulate a New Federal Indian Policy In California
           Through a Dialogue Between the Federal government and the
           California Indians .......................................................................................... 10
       3.  The Need to Address Specific Substantive Issues Identified in
           the Advisory Council's Reports ......................................................................... 10
   D.  The Advisory Council's Proposed Definition of California Indian ................................. 11

II.  The Reports and Recommendations ............................................................................ 12

   A.  The Report of Federal Recognition ......................................................................... 12
   B.  The Report on Termination ................................................................................... 16
   C.  The Community Services Report ............................................................................. 19
   D.  The Report on Economic Development ..................................................................... 23
   E.  The Report on Trust and Natural Resources ............................................................. 28
   F.  The Report on Indian Education ............................................................................. 31
   G.  The Report on California Indian Cultural Preservation .............................................. 37
       Recommendations for Congress ............................................................................ 38
   H.  The Report on Indian Health ................................................................................ 43

   Endnotes ............................................................................................................... 47

# I.    Introduction

## A.    Creation of the Advisory Council on California Indian Policy

In the Advisory Council on California Indian Policy Act of 1992,[1] Congress established a statewide Indian Council consisting of representatives of federally recognized, terminated and unacknowledged California tribes. The Advisory Council was directed to submit recommendations to Congress regarding remedial measures to address the special status problems of California's terminated and unacknowledged tribes, and the needs of California Indians relating to economic self-sufficiency, health and education. Section 5 of the Act provides, in part, that the Council shall:

> (3) conduct a comprehensive study of -
>
> > (A) the social, economic, and political status of California Indians;
> > (B) the effectiveness of those policies and programs of the United States that affect California Indians; and
> > (C) the services and facilities being provided to California Indian tribes, compared to those being provided to Indian tribes nationwide . . .

And further provides that the Council shall:

> (6) submit, by no later than the date that is 36 months after the date of the first meeting of the Council, a report on the study [studies] conducted under paragraph (3) together with proposals and recommendations . . . and such other information obtained pursuant to this section as the Council deems relevant, to the Congress, the Secretary, and the Secretary of Health and Human Services; and
>
> (7) make such report available to California Indian tribes, tribal organizations and the public.

The Advisory Council, which held its first meeting in April 1994, established special task forces on recognition, health, education, economic development, culture and community services (encompassing governance and census issues) and held numerous public hearings throughout California. Its reports address each of these subject areas, in addition to termination issues and the relationship between the federal trust responsibility and the protection of Indian lands and natural resources in California. On July 27, 1997, the Council held a statewide meeting of the California tribes in which it reviewed and received further public comments on the final drafts of the Council's reports.

Gathering information in each of these subject areas from California's many recognized, terminated, and unacknowledged tribes, and from the Bureau of Indian Affairs (BIA) and other federal and state agencies, has been a daunting task. Many people have assisted and cooperated in this historic endeavor, which represents the first time that California Indians have been invited to speak directly to Congress about their problems. Thus, the Council's reports and recommendations represent the views of California Indian people speaking about their problems, most of which can be traced to their unique historical circumstances and the inconsistent and misguided federal policies that have shaped their history.

The Advisory Council's report to Congress includes this executive summary, eight separate reports (on recognition, termination, health, education, culture, community services, economic development, and natural resources/trust responsibility), and an overview of California Indian history.

## B.    Context of the Work of the Advisory Council

The reports of the Advisory Council focus on the contemporary and continuing effects of the federal government's unjust and inequitable treatment of the California Indians. Not injustice isolated in time or effect, but a pattern of injustice that stretches across the better part of two centuries and threatens to enter a third. Not injustice based on ignorance or inadvertence, but injustice that has been acknowledged, documented and studied by the federal government—then to a large extent ignored. Institutionalized injustice that has affected every aspect of Indian life in California. Injustice which has evolved from state-sanctioned efforts to "exterminate" the Indians, to federal policies that perpetuate various forms of economic and social oppression, deprivation of rights, and poverty within California's Indian communities.

Thus, it is appropriate that a brief history of the California Indians be given in order to understand and place in context their present situation. Although the Advisory Council's recommendations are forward-looking, the unique history of the California Indians and the extraordinary regularity with which they have been studied in the past, then largely ignored, serves to place their recommendations in a clearer light.

### 1.  A Federal Pattern of Dishonor and Neglect

While the history of the Federal-Indian relationship in California shares some common characteristics with that of Native peoples elsewhere in the United States, it is different in many aspects.[2]  It includes the unprecedented magnitude of non-native migration into California after the discovery of gold in 1848, nine days before the signing of the Treaty of Guadalupe Hidalgo; the Senate's refusal to ratify the 18 treaties negotiated with California tribes during 1851-52; and the lawless nature of California's settlement after the Treaty of Guadalupe Hidalgo, including state sanctioned efforts (countered only by nominal federal resistance) to "exterminate" the indigenous population.[3]

A number of major events which occurred during the period from 1848 to 1853 had significant negative consequences for California Indians. The 1848 Treaty of Guadalupe Hidalgo between the United States and Mexico had resulted in a large cession of land to the United States, including more than 70,000,000 acres in California to which the California Indians had aboriginal title.[4]  Although the United States initiated efforts to investigate and resolve the Indians' claims, these efforts were thwarted by the discovery of gold in California in 1848 and the subsequent influx of thousands of Anglo-Europeans, hungry for California's mineral wealth and its vast fertile valleys, who immediately clashed with the Indians. In addition, the admission of California to statehood in 1850 increased resistance by the State's representatives to the Indians' land claims.

At the federal level, in 1851 the United States had Commissioners in the field negotiating treaties with approximately one-third to one-half of the California tribes. Eighteen treaties were negotiated with 139 Indian signatories between March 19, 1851, and January 7, 1852.[5]  However, when the treaties were presented to the United States Senate, under pressure from the California congressional delegation, it refused to ratify them. Additionally, the Senate took the extraordinary step of placing the treaties under seal. Contemporaneous with the initiative to negotiate treaties with the California tribes, Congress had passed the Land Claims Act of 1851,[6] which provided that all lands in California, the claim to which was invalid or not presented within two years of the date of the Act, would pass into the public domain. Thus, while the treaty negotiations were in progress, the limitations period on all California land claims, including Indian claims, was running as matter of federal law. Not surprisingly, the California Indians were unaware of the need to present their claims, and failed to meet the 1853 statutory deadline.[7]  Their fate as landless Indians was then sealed when the Senate refused to ratify the treaties. Deprived of protected legal title to their lands by treaty or formal claim, the California Indians, with the exception of certain bands of Mission Indians which were protected in their occupancy by early Spanish land grants, became homeless.

These actions by the United States Government are the genesis of the tribal status problems in California. Had the treaties been ratified, they would have established an Indian land base in California of approximately 8.5 million acres, and accorded formal recognition to most of the unacknowledged California Indian groups that are currently seeking federal recognition. In addition, had Congress required the Attorney General to file claims on behalf of the unlettered and uninformed Indian tribes under the 1851 statute's claims procedure, it is likely that additional California tribes would have been recognized and their lands protected from adverse claims. Because of these early breaches of faith by the United States, the California Indian land base today is minuscule, a large number of California tribes have no land whatsoever, and the majority of California Indians, whose lands were taken and tribes dispersed through allotment and military force, are deemed ineligible for programs funded through the BIA.

To say that the native Indian tribes and bands of California suffered greatly with the influx of Anglo-Europeans during the mid-1800s is to grossly understate the brutality with which they were treated. The California Indian population in 1851 has been conservatively estimated at over 100,000.[8] Thirty-nine years later, the report of the Commissioner of Indian Affairs for 1890 recorded a population of 15,293. This represents almost an 85% decline in population from the most conservative 1851 population estimates. Indian people were forced off their land, relocated away from populated areas, and often served as a source of indentured labor for the largely White population. It was not unusual during this wild period of California history for groups of Indians to be hunted down and slaughtered with impunity.[9] Indian culture was brutally repressed and the federal government's weak attempts to protect isolated Indians from genocide (the term "extermination" was in popular usage at the time) by certain elements of the White population were largely unsuccessful. Some Indian groups were forcibly removed to the four authorized California reservations,[10] but even this "solution" afforded them only a small measure of physical protection and subsistence.

Major shifts in federal Indian policy at the national level during the late 19th century exacerbated the Indian problems in California. The passage of the General Allotment Act in 1887 opened parts of the limited number of Indian reservations in California to non-Indian settlement and divided the tribal land base. More lands passed out of Indian ownership, Congress' efforts to assimilate the Indian people failed, and more California Indians were rendered homeless and defenseless against a hostile White population. The situation at the turn of the last century was exceedingly grim. The incidence of disease and death among California Indians was extremely high, tribal culture in many areas had been devastated, and most of the dwindling population of California Indians sought refuge in remote areas of the state where they were tolerated rather than accepted.

In 1905, the injunction of secrecy on the 18 unratified treaties was removed by order of the Senate, and for the first time the public was informed of their existence. At the behest of government officials and citizens sympathetic to the economic and physical distress of California Indians, Congress passed special legislation to acquire isolated parcels of land for homeless California Indians. The Indian Appropriation Act for the fiscal year ended June 30, 1905, authorized an investigation of the conditions among the Indians of northern California and directed that some plan for their improvement be submitted to the next Congress. C.E. Kelsey was designated special agent to conduct the investigation. Kelsey commenced his investigation on August 8, 1905, and over the next several months personally inspected almost every Indian settlement between the California-Oregon border and Mexico. Between 1906 and 1910, a series of appropriation Acts were passed that provided funds to purchase small tracts of land in the central and northern parts of the state for landless Indians of those areas. A number of Indian communities, and remnant groups of larger aboriginal tribes and bands, were restored to modest parcels of land and given some measure of protection and recognition by the federal government. These land acquisitions resulted in what has been referred to as the Rancheria System in California.

In 1934, Congress passed the Indian Reorganization Act (IRA).[11] The IRA announced a new federal Indian policy encouraging tribal self-government and eliminating the "absolutist" executive discretion previously exercised by the Interior Department and the Office of Indian Affairs.[12] In addition, it stemmed the dramatic loss of Indian land that had become the hallmark of the Allotment Period[13] by prohibiting the transfer of Indian land except under narrowly defined conditions.[14] Pursuant to the IRA's policy of reconstituting tribal governments, the BIA supervised elections among the California tribes, including most of the rancheria groups, on whether to accept or reject the tribal reorganization provisions of the IRA.[15]

Although many tribes accepted the provisions of the Act, ultimately, few California tribes benefitted economically from the IRA because of the continuing inequities in the funding of federal Indian programs in California[16] and the fact that implementation of the IRA in California was cut short by another shift in federal Indian policy.

Beginning in 1944, forces within the BIA began to propose partial liquidation of the rancheria system.[17] This recommendation was prompted in part by a sincere dissatisfaction with the inherent problems that existed as a result of the way the rancherias were acquired and managed by the federal government. Yet, this limited initiative evolved over the next 14 years into a policy that advocated termination of the federal trust responsibility to *all* California tribes and the total withdrawal of BIA programs from California. Thus, even the limited efforts to address the needs of California Indians at the turn of the century, and again through passage of the IRA, were halted by the federal government when it adopted the policy of termination. California became a primary target of this policy when Congress slated forty-one (41) California rancherias for termination pursuant to the Rancheria Act of 1958.[18]

Under the terms of the Rancheria Act, lands were distributed in fee to individual Indians, but the water and sanitation facilities promised the Indians under the terms of the Act were, in virtually every circumstance, either inadequate or not provided at all. Moreover, the Indians' dire need for adequate housing was not even addressed. As a consequence, most of the distributed lands were rendered uninhabitable and were subsequently sold or passed out of Indian ownership pursuant to tax sales, or sales made under duress to obtain the most basic necessities of life. This situation persisted until the late 1960s when the California tribes, assisted by Legal Services attorneys, commenced a series of lawsuits to un-terminate the California rancherias and to restore to California tribes and bands the recognition, authority and eligibility for programs that had been stripped from them by the ill-fated termination policy and decades of BIA inaction and incompetence in overseeing their Indian affairs.

During the past quarter century, judicial decisions and settlements have restored 27 of the 38 rancherias that were terminated under the original Rancheria Act.[19] Two additional tribes, the United Auburn Indian Community and the Paskenta Band of Nomlaki Indians, were restored by Acts of Congress in 1993.[20]

Since the late 1960s and the advent of the Indian Self-Determination Policy, California tribes—federally recognized, terminated and unacknowledged—have struggled on a number of fronts to reverse the effects of inconsistent federal policies and institutionalized federal neglect of the California Indians. Their efforts have been concentrated in four major areas: (1) equal treatment and parity in funding between BIA programs and services provided through the Sacramento Area and other BIA Area Offices; (2) restoration of federal recognition and services to tribes terminated under the California Rancheria Act; (3) implementation of federal acknowledgment criteria that accord fair consideration to the unique history and problems of California's unacknowledged tribes; and (4) the eligibility of non-federally recognized California Indians for Snyder Act programs. The Advisory Council's reports document these decades-long efforts and provide compelling justification for Congressional intervention to resolve them in a manner favorable to the California Indians.

## 2. Federal Awareness of the Situation of the California Indians (1852-1997)

There are few, if any, tribes of American Indians which have been studied with the frequency and attention accorded the California Indians. With an astonishing regularity, Congress, the Executive Branch, the State of California, and private entities, have been motivated to examine and report on the condition of the California Indians. What motivated them? Certainly, to some extent, the complaints and pleas of the California Indians themselves. But, even more so, the authors of these reports were moved by the clear injustice of the Indian situation in California. E. F. Beale, Superintendent of the California Indian Agency, writing in 1852 to the Commissioner on Indian Affairs, advised that if the government failed to take immediate measures to preserve the California Indians from "total extinction" it would subject the American republic to "everlasting disgrace."[21] Superintendent Beale was alluding to the responsibility that arose from the government's knowledge of the Indians' desperate condition; that, at some point, governmental neglect in

the face of such knowledge and the means to redress the Indians' condition would be seen as malevolent and disgraceful. As Beale put it, action was necessary "to [preserve] us ... from the charge of intentional and premeditated extinction of our Indian population." His words, with their references to the gap between the observed injustices and the political will to redress them, and to the conflict between the accumulation of wealth and the observance of basic human rights, ring true today:

> Driven from their fishing and hunting grounds, hunted themselves like wild beasts, lassoed, and torn from homes made miserable by want, and forced into slavery, the wretched remnant which escapes starvation on the one hand, and the relentless whites on the other, only do so to rot and die of a loathsome disease, the penalty of Indian association with frontier civilization. . . . I earnestly call the early attention of the government to this condition of affairs, and to a plan I have proposed in a previous letter for its relief. It is a crying sin that our government, so wealthy and so powerful, should shut its eyes to the miserable fate of these rightful owners of the soil. What is the expense of half a million for the permanent relief of these poor people to a government so rich? A single dry-dock, or a public building, costs twice that, and is voted without a dissenting voice: and yet here are seventyfive thousand human beings devoted to a death so miserable that humanity shudders to contemplate it, and these very people the owners of that soil from which we monthly receive millions; that very soil whose timely golden harvests have saved from bankruptcy, probably, the very men who will oppose this appropriation. I ask an appropriation of five hundred thousand dollars for the Indians in this State.[22]
> [Emphasis in original.]

Beale's plea for the Indians' relief established themes that echo in every report and statement on the condition of the California Indians spanning the last century and a half: governmental knowledge of the inhumanity and injustice of the treatment of the Indians, followed by either its refusal to act or its adoption of a policy or course of action that provided little to alleviate the conditions complained of, and in some instances actually aggravated them. The Advisory Council's reports, submitted almost a century and a half after Beale's, provide recommendations designed to break this historical pattern of federal malfeasance and neglect.

In general, Beale's report and those that followed envisioned a federal response that would improve the health, education and general welfare of the California Indians. It is thus appropriate, in this first report to Congress by the California Indians themselves, to list some of the most significant of these earlier reports and to provide excerpts from each, which demonstrate the history of the inequitable treatment of the California Indians.

## 1883: Report on the Condition and Needs of the Mission Indians of California, Made by Special Agents Helen Jackson and Abbot Kinney, to the Commissioner of Indian Affairs[23]

> From tract after tract of [their aboriginal] lands they have been driven out, year by year, by the white settlers of the country, until they can retreat no farther. . . . The responsibility for this wrong rests, perhaps, equally divided between the United States Government, which permitted lands thus occupied by peaceful agricultural communities to be put "in market," and the white men. . . . The Government cannot justify this neglect on the plea of ignorance.[24]

> We recommend the establishment of more schools. At least two more are immediately needed. . . . These Indians are all keenly alive to the value of education. In every village that we visited we were urged to ask the Government to give them a school.[25]

## 1906: Report of Special Agent C.E. Kelsey to the Commissioner of Indian Affairs[26]

The responsibility of the National Government for the present condition of the non-reservation Indians of California seems clear. Had the Government given these Indians the same treatment as it did other Indians in the United States, their condition today would be very different. . . .

. . . It should be remembered that the Government still owes these people considerable sums of money, morally at least, but the Government owes more than money. No amount of money can repay these Indians for the years of misery, despair, and death which the Governmental policy has inflicted upon them. No reason suggests itself to your special agent why these Indians should not be placed in the same situation as all other Indians in the United States. . . .[27]

## 1926: Transactions of the Commonwealth Club of California[28]

The executive has always in fact admitted a much more definite obligation toward Indians whose right to land, assistance, and protection, was specifically safeguarded by treaty, than to those unfortunate Indians, like those of California, who have never been able to point to a definite promise on the part of the United States measuring the irreducible minimum of protection to which they were entitled.[29]

## 1926: The Legal Status of the California Indian[30]

[The Indians of California] are the neediest of their race, and yet they receive, in educational and health services, and in more direct aid, far less per capita than the average throughout the country.[31]

## 1933: Superintendent O.H. Lipps' Statement on the Condition of the California Indians Under the Jurisdiction of the Sacramento Indian Agency[32]

In the first place, it should be stated that the situation of the Indians under this [Sacramento Indian] Agency differs from that in any other part of the State or Nation where large numbers are affected. Here the Indians were ruthlessly and utterly dispossessed by the early gold miners, and unlike Indians in the extreme Northwestern and Southern parts of the State, no Executive Order, or other reservations were ever provided for those living in the Sacramento and Joaquin valleys and along the Sierra foothills. . . . From a condition of self-supporting, free men they were at once reduced to a state of peonage, in many cases were sold into slavery, and thus despoiled of the lands of their fathers and ground down into the earth by irresistible force, they have been almost compelled to become vagabonds and pitiable objects of destitution, want and misery. [33]

You and other members of your Committee visited and inspected a number of these rancherias when you held hearings in California last year. You saw how utterly hopeless it is for the Indians to improve their conditions without some aid from the Government. You heard the stories of their destitution and suffering from the Indians themselves, and I am sure your personal knowledge of the situation will enable you forcibly to present their needs and the justice of their plea for help to the proper authorities in Washington who may be in position to answer, at least in part, their cry for help.[34]

## 1937: Report of the Secretary of the Interior on Senate Bill 1651 and Senate Bill 1779, to Amend the California Indian Jurisdictional Act of May 18, 1928

The total of land now held in trust for California Indians, much of it of poor quality, is approximately 368,000 acres. But there has been no adequate assistance in matters of credit or agricultural organization; and it must be said that an expenditure of not less than $20,000,000 of Federal funds, across 50 years of time, has left the great majority of the California Indians in a state of acute poverty.

**1944:** <u>The Status of the Indian in California Today, A Report by John G. Rockwell, Superintendent of the Sacramento Agency to the Commissioner of Indian Affairs</u>

With little land, with no other resources, with not even adequate credit facilities available, the thought is inescapable that the restrictive control exercised by the Federal Government over these Indians is a handicap rather than an assistance.[35]

... We need to take stock of ourselves and recognize how woefully inadequate our Welfare Service is. [36]

**1969:** <u>Final Report to the Governor and the Legislature by the State Advisory Commission on Indian Affairs</u>

[We recommend that the] California Indians be declared eligible to participate in all federally funded programs for Indians on the same basis as Indians in other states. . . .[37]

**1969:** <u>Senate Joint Resolution No. 32, California Legislature, August 21, 1969</u>[38]

Whereas, The Indians of California are virtually excluded from participation in various federal programs and services that are available to other Indians of the United States; . . . . therefore, be it

*Resolved by the Senate and Assembly of the State of California, jointly,*

That the Legislature of the State of California respectfully memorializes the President and the Congress of the United States to establish a policy that insures that California Indians are included to the fullest extent in various federal programs and services that are available to other Indians of the United States.

**1969:** <u>Report of United States Senate Special Subcommittee on Indian Education of the Committee on Labor and Public Welfare</u>

While the Federal Government has been devising new programs to assist the Indian and while Congressional expenditures for Indian education have increased significantly since World War II, these benefits have not accrued to California Indians. The withdrawal in the late 1940's and early 1950's of the already minimal Federal assistance which California Indians then received has been well documented. . . . Although the Federal program [for Indian health care] in California was never large, even that was phased out by the Public Health Service [after it assumed responsibility in 1955]. . . . The Federal government discontinued its minimal welfare assistance to California Indians in 1952. . . .

**1971:** <u>Decent Homes: A Report on the Need for an Emergency Housing Grant for Rural California Indians, California Indian Legal Services</u>[39]

Out of a rural Indian population of about 40,000, *at least seventy per cent*, and probably closer to ninety per cent, are ill housed. . . . During the last three years, the Bureau of Indian Affairs in California has had an annual housing budget of about $300,000 per year. . . . [which] represents about one per cent of the money needed to substantially improve the overall housing picture for California Indians. . . . It is estimated by Bureau officials that to substantially correct the situation, about *thirty million dollars* would be needed in California.[40] [Emphasis in original.]

**1972:** <u>Statement of Senator John Tunney before the United States Senate: Discrimination against California Indians</u>[41]

. . . California is not now receiving a fair share of BIA and IHS funds and all California Indians are morally and legally entitled to participate on an equal basis in BIA and IHS programs in the fields of education, health, housing, and economic development.

## 1973: Indian Eligibility for Bureau Services—A Look at Tribal Recognition and Individual Rights to Services[42]

[H]istorically, <u>California</u> Indians have received much less consideration than Indians of other states. . . .[43] [Emphasis in original.]

. . . California Indians number 36,489 as documented by the 1970 census. They are all presently eligible for BIA services, yet the Bureau has only been funded to serve the 6,151 Indians living on trust lands. It is true that all of the native California Indians have been served to some extent, yet the degree has been greatly limited by the available funds. It is apparent that the BIA must be appropriated the funds which are commensurate with its obligation.[44]

The 1973 BIA budget allocated $5,117,000 to spend for California Indians. To bring the allocated funds in accordance with the true eligible service population, the federal government should appropriate approximately $11,172,000 which includes $600,000 for Johnson O'Malley funds to help remedy the educational crisis among native California Indians.[45]

## 1976: Study by the Department of Housing and Community Development, State of California

Examination of the Bureau of Indian Affairs (BIA) Budget data since 1969 reveals that California has not been receiving its fair share of BIA allocations based on its service population or on its needs and that action is required to rectify the present inequitable funding levels.

California Indians who comprise almost 7% of the BIA's service population have received only 1 - 2% of the Bureau's total budget since 1969. . . . [L]ong term underfunding of the Bureau's Sacramento Area Office (encompassing the State of California) has caused economic hardship for the Indians of California.

## 1977: A Report to the Commissioner of the Bureau of Indian Affairs Regarding Funding of Bureau Programs in the Sacramento Area[46]

[A chart for FY 1975] shows the percentage of the total [B.I.A.] allotment for each area, i.e. Sacramento received 1.32% of the total funds available with a population of 36,255 or 6.68% of the population. Based on population, Sacramento has a low $309.97 of the total allotments made for Fiscal Year 1975. . . . Minneapolis's net allotment is $859 per person. . . . [T]he average for Billings is $970 [per person] . . . . [T]he average for Portland is $1,576 per person. . . .[47]

## 1984: Report of the California Indian Task Force[48]

Administratively, the Sacramento Area in Fiscal Year 1984 had an assigned budget of $14,212,000 representing 1.7 percent of the overall Bureau budget and approximately <u>173</u> [personnel] positions . . . compared to a Bureau-wide total of 14,690 or 1.2 percent.[49] [Emphasis in original.]

[For California Indians] there are large areas of unmet needs in terms of housing, educational levels and in nearly all areas of Bureau programs that are normally provided elsewhere. . . .[50]

. . . . The funding base of five or ten years ago appears to have been established at minimum levels to accommodate a program directed toward a land base that has not changed significantly but which requires a higher level of management and toward a population base greatly underestimated. . . . Even a three-fold increase in base funding for California would not address the needs of approximately 50,000 California Indian people who cannot establish tribal membership but who are nevertheless eligible for many programs.[51]

In summary, funding levels determining the base allocation for the Sacramento Area are based upon incorrect numbers. Few programs, availability of some State programs and a service concept based upon trust property management and individual service has kept funding levels low. Moreover, because of the long period involved in

termination matters here in the State of California, general programs to meet the needs of the Indians of California, whether they be members of tribal or other groups or not, has [sic] been inadequate.[52]

## 1991: Summary Report on the California Consultation Meeting, Stanford University, May 5, 1991[53]

Historically, the Bureau's programs in California have focused upon programs related to trust land and assets and upon limited services to Indian people who were either reservation/rancheria residents or in close proximity. Hence, base funding levels in California have always been extremely limited and inadequate. Established at minimal levels, funding has remained relatively constant for years. Funding levels do not reflect any adjustments to accommodate increasing workload, increasing demands for services, an increase in the number of tribal governments, and increasing need based on the increasing capability of tribal governments.

A strong theme evident throughout the testimony was the inadequacy and inequity of California funding levels. In many instances, equity funding was tied to a request for base tribal funding. While equity arguments certainly support such funding, testimony made it clear that the equity issue goes beyond the immediate need for base funding. As tribal capability increases, the opportunity and need to expand into additional activities increased also. Hence, base funding represents the starting point for redressing equity issues.

Still to be addressed is the larger question of how, in a more equitable manner that is responsive to the total situation in California, to allocate total federal dollars. Both on a tribal basis and in terms of total Indian population, California has been grossly under funded.[54]

These and other reports support the premise that inconsistent and misguided federal policies have played a dominant role in denying many California Indians their status as tribal peoples, and in perpetuating the gross under-funding of Indian programs and services in California. Within the Departments of the Interior and Health and Human Services, the Advisory Council's reports document a pattern of institutional bias, if not outright discrimination, against California Indians in the funding and implementation of these programs and services relative to other areas of the country.[55]

## 3. The Time for Decisive Federal Action Is *Now*

History cannot be rewritten, yet its continuing effects can be examined and understood, and efforts initiated in the present to remedy them. This is the goal of the Advisory Council: that its recommendations not languish with those of previous reports, but instead provide a blueprint for a unique partnership between the California Indians, Congress and the Executive Branch, within the context of the Federal-Indian trust relationship and Congress' long-standing dealings with the California Indians, to address the special status problems of California's unacknowledged tribes and the institutionalized under-funding of federal Indian programs and services in California.

Looking at the current problems of California Indians against the sobering backdrop of California Indian history, it is not surprising that in many areas the California tribes have fallen far short of their aspirations and potential. Congress itself recognized this in the language and purpose of the Advisory Council on California Indian Policy Act of 1992, and in the Act's intent to give the California Indians a primary role in the formulation of recommendations to address these problems. To this end, the recommendations of the Advisory Council are forward-looking, targeting the present-day effects of past injustices and proposing solutions that will require a true partnership and close cooperation between federal and tribal officials into the next century.

Case 5:07-cv-02681-JF    Document 1-5    Filed 05/21/2007    Page 15 of 32

### C.    Major Themes of the ACCIP Reports

There are three major areas of need identified by the Advisory Council in its reports. These needs gravitate around the themes of relationship, policy and specific substantive issues. An examination of the specific problems, however, reveals that the failure of relationship and policy is pervasive. Thus, the recommended solutions to substantive problems frequently depend on and are tied to changes in federal policy and, ultimately, the way in which the federal government deals with California Indians.

### 1. The Need to Recast the Federal-Indian relationship in California

California Indians seek a *true partnership* with the federal government *based on principles of justice and equity*. This means creating new opportunities by linking federal resources and support with demonstrated and potential tribal self-sufficiency initiatives. California Indians seek the opportunity to fully develop and build upon their own initiatives for survival and self-determination, but they need the support of Congress and the Executive Branch in creating the appropriate legal and financial mechanisms to implement the Advisory Council's recommendations, coupled with the technical assistance necessary to develop and enhance tribal capacity.

### 2. The Need to Formulate a New Federal Indian Policy in California Through a Dialogue Between the Federal Government and the California Indians

For more than a century, California Indians suffered the unilateral imposition of federal policies of forced assimilation, neglect and termination. Even when genuine concern was expressed for the needs of the California Indians, the proposed solution, with rare exceptions, was formulated by the BIA based on *its* view of the Indians' needs. Today, this lack of dialogue is manifest most clearly in the BIA's attempts to restrict eligibility for federal Indian programs and services to members of federally recognized tribes—in violation of federal law and contrary to its own past dealings with other categories of California Indians.[56] Continuation of this kind of one-sided policy formulation is neither acceptable nor appropriate in light of Congress' broad and unprecedented mandate in the Advisory Council on California Indian Policy Act of 1992.[57]

Speaking on the floor of the House regarding passage of the Act and the significance of the Advisory Council's report to Congress, Representative George Miller put it this way:

> This report will provide a blueprint for the future of California Indians. We will use the recommendations of the council as we approach California Indian policy in the 1990s and on into the next century. The bill puts the tribes at the helm and empowers them to come up with new ideas to achieve funding equity and to resolve the plight of unacknowledged tribes.[58]

### 3. The Need to Address Specific Substantive Issues Identified in the Advisory Council's Reports

Two major substantive themes surface throughout the reports: (1) unresolved questions of tribal and individual Indian status; and (2) the historical and continuing inequities in the development and funding of federal Indian programs and services in California. A third theme, which lies at the heart of tribal economic

survival and the promise of self-determination, is the lack of adequate tribal homelands in California. Currently, federal policy and/or legislative constraints limit development of a comprehensive program for addressing the land needs of California tribes.

### D.    The Advisory Council's Proposed Definition of California Indian

The Advisory Council's recommendation for a new definition of "California Indian" is relevant to each of the Council's reports and is, therefore, repeated in most. More importantly, the definition is an integral part of the Council's effort, through its recommendations, to reestablish the proper boundaries of the Federal-Indian trust relationship in California. Moreover, the Council's proposed definition parallels Congress' adoption, in the Indian Health Care Improvement Act Amendments of 1988, of a uniform definition of California Indian for purposes of health care.[59]

Historically, Congress has dealt with California Indians as a discrete group for purposes of federal benefits and services, as evidenced by the Homeless California Indian Appropriations Acts of the early 1900s, the California Indian Claims Cases, and the current eligibility of California Indians for health care services provided by the Indian Health Service (IHS).  In addition, several federal agencies have recognized the unique history of federal relations with California Indians, and have adjusted their eligibility criteria accordingly. These federal actions are consistent with the principle that programs authorized by the Snyder Act,[60] which is the primary authority for most BIA and IHS programs, are for the "special benefit" of all Indians, and that any ambiguity should be resolved in favor of *inclusion*.[61] The BIA, however, after decades of similarly recognizing the broad eligibility of California Indians for federal Indian programs has, since the mid-1980s, insisted that only members of federally recognized tribes are eligible for the services it provides, even where the particular statute or regulation is intended to have a broader application.

Thus, the Advisory Council strongly urges Congress to reconfirm its long-standing relationship with *all* California Indians by adopting the following definition of California Indian for purposes of eligibility for all programs and services available to Indians based on their status as Indians:

"California Indian" shall include:

- any member of a federally recognized California Indian tribe;

- any descendant of an Indian who was residing in California on June 1, 1852, but only if such descendant
  - is a member of an Indian community served by a tribe, the BIA, the IHS or any other federal agency, and
  - is regarded as an Indian in the community in which such descendant lives;

- any California Indian who holds trust interests in public domain, national forest or Indian reservation allotments in California;

- any California Indian who is listed on the plans for distribution of assets of California rancherias and reservations under the Act of August 18, 1958 (72 Stat. 619), and any descendant of such an Indian; and

- any California Indian who is listed on the rolls of California Indians prepared in 1933, 1955 and 1972 for the distribution of the United States Court of Claims and Indian Claims Commission awards.

## II.   The Reports and Recommendations

The Advisory Council reports and recommendations are, as Congressman George Miller aptly stated, "a blueprint for the future of California Indians," and should, as he suggests, put "the tribes at the helm" so that the solutions implemented are those of their own choosing.

The eight reports cover the following subjects: Recognition, Termination, Community Services, Education, Economic Development, Trust and Natural Resources, Culture, and Health. In addition, the Historical Overview report, which provides important historical information on the California Indians and their relations with the federal government, will assist the reader in placing the reports and recommendations in context. What follows is a brief summary of each report, accompanied by a list of the related Advisory Council recommendations. Some recommendations, such as the proposed definition of "California Indian," appear in more than one report because of their importance and relevance to more than one subject area.

---

### A.   The Report on Federal Recognition

**Summary:** At every hearing the Advisory Council conducted, the testimony confirmed that tribal status clarification is a primary issue of concern to California Indians. The term "unacknowledged" refers to those Indian groups whose status as tribes has never been officially "recognized" by the United States or, if recognized in the past, is now denied by the United States. There are more unacknowledged Indian tribes in California than in any other single state.

The current federal acknowledgment process (25 C.F.R. Part 83) is not appropriate for California tribes. Since the procedure was established in 1978, only one California tribe has successfully completed the process. A major problem with the current process is that it requires unacknowledged tribes to prove their status as self-governing entities continuously throughout history, substantially without interruption, as though that history did not include the federal and state policies that contributed to the destruction and repression of these very same native peoples and cultures.

The issue of federal recognition is crucial to all California Indians because its focus is the development of a coherent and consistent federal process for determining which Indian tribes shall be included within the federal-tribal trust relationship. This report discusses the history of federal neglect of California Indians and how that history has led to the current situation of many of the unacknowledged tribes. It also discusses the problems presented by the current federal acknowledgment process, and explains how the proposed "California Tribal Status Act of 1997," or equivalent administrative policy and regulatory changes, will result in a more just procedure for California tribes seeking federal acknowledgment.

The report does not recommend specific tribes for recognition, because the entire recognition process, as applied to California Indians, is flawed. Indeed, the Advisory Council recommends that the Federal Acknowledgment Procedure be modified to ensure that all California tribes seeking recognition are assured of a fair determination of their status.

### Recommendations:

1. **The California Tribal Status Act of 1997 (CTSA) should be enacted to address the unique status problems of California's unacknowledged tribes.**

**Discussion:** This California-specific legislation contemplates the creation of a Commission on California Indian Recognition with the authority to review and decide petitions for federal acknowledgment submitted by unacknowledged California Indian tribes under definite administrative procedures and guidelines. These procedures and guidelines have been developed through an extensive consultation conducted under the auspices of the Advisory Council and involving representatives of California's federally recognized, terminated and unacknowledged tribes, as well as California's highest ranking BIA and Indian Health Service (IHS) representatives.

The federal acknowledgment criteria contained in the draft bill are derived from early standards for federal recognition discussed by former Solicitor Felix S. Cohen in his treatise on Federal Indian Law (the Cohen criteria). The existing federal regulations (25 C.F.R. Part 83 — Procedures For Establishing That An American Indian Group Exists As An Indian Tribe), judicial decisions, as well as the provisions of earlier federal acknowledgment bills introduced in the House and Senate, were also used. The proposed criteria contain special provisions that address the unique problems the existing federal acknowledgment process poses for California tribes.

The Advisory Council recommends that the 12-year Commission, which would be based in California, be supported by an annual appropriation of $1,500,000 for the lifetime of the Commission. It should be noted that funding of the BIA's Branch of Acknowledgment and Research (BAR) for the last 17 years has not materially assisted in the resolution of acknowledgment petitions submitted by California tribes.

    2.   **As an alternative to legislative action, the Secretary of the Interior should institute fundamental policy changes to the Federal Acknowledgment Process on behalf of California's unacknowledged tribes. These changes should include:**

    a. Use of rebuttable presumptions to: (1) mitigate the historical effects on California's unacknowledged tribes of repressive federal and state Indian laws and policies that sought to destroy or discourage essential aspects of tribal authority and culture; and (2) extend federal acknowledgment to tribes meeting the previous federal acknowledgment standards;

    b. An allowance for gaps of up to 40 years in the proof submitted in support of a petitioner's identification as an Indian group and its exercise of political influence or use 1934, the date of the Indian Reorganization Act, as the date from which proof of these criteria shall be required;

    c. Evaluation of evidence of "community" for California Indian groups should focus on networks of social interaction between group members, rather than on geographic proximity of community members; and

    d. Revision of the term "predominant portion," as it applies to that part of the membership of the petitioner comprising a community, to a "substantial portion."

**Discussion:** The application of a rebuttable presumption to three of the BAR criteria for federal acknowledgment (identification as an Indian group on a substantially continuous basis, evidence of community, and exercise of political influence or authority) creates a fairer allocation of the burden of proof. See Section 6(c) of the CTSA. In addition, the California approach creates a rebuttable presumption of federal acknowledgment if the following three requirements are met:

    — not less than 75 percent of the current members of the petitioner are descendants of members of the California Indian group with respect to which the petitioner bases its claim of acknowledgment;

    — the membership of the petitioner is composed primarily of persons who are not members of any other Indian tribe; and

    — the petitioner is the successor in interest to a treaty or treaties (whether or not ratified), or has been the subject of other specifically listed federal actions.

Once these requirements are met, the presumption is that the petitioner has been previously acknowledged and is deemed to have met the first three criteria for present acknowledgment. See Sections 6(d)(1) and (2) of the CTSA.

The Advisory Council recommends that the criteria dealing with identification as an Indian group and the group's exercise of political influence over its members allow for gaps of up to 40 years and include a rebuttable presumption stating that changes in the community interaction, organization or political influence of a California Indian group, which occurred during the period 1852 to 1934, did not constitute either abandonment or cessation of tribal relations. The reason for the allowance for interruptions and this presumption is that the federal government should not be allowed to benefit from its own policies and laws, and those of the State of California, which prohibited or discouraged essential elements of tribal authority and culture during this time period. In effect, the federal and state governments created conditions in California during this period that made it impossible, or extremely dangerous or difficult, for most California Indian tribes, especially those who were not "protected" by the Missions, to freely or publicly engage in tribal relations or to identify themselves as Indians. It would be unconscionable to force California Indian groups that suffered through this period to provide evidence that, for the most part, does not exist because of the actions or neglect of the federal and state governments. If there has been voluntary abandonment or cessation of tribal relations during this period, it is properly the federal government's burden to prove it.

A second approach would be to require proof of identification as an Indian group from 1934, the date of the Indian Reorganization Act (IRA), to the present. This approach makes sense for two reasons. First, the advent of a new Indian reorganization policy represented the first time, since the pre-treaty era, that California tribes were encouraged to function openly and publicly. Second, using 1934 as the base date would also eliminate the need to include those provisions mentioned above governing presumptions and allowances for interruptions in continuity of tribal identity and exercise of tribal political influence. For example, a petitioner would have to demonstrate evidence as a distinct Indian group from 1934 to present, and if the character of the group as an Indian entity has from time to time been denied, this would not be considered conclusive evidence that this criterion has not been met. This would be a workable and fair way to apply this criterion to petitioning California tribes.

The Advisory Council recommends that the term "community" be defined more broadly to account for the fact that genocide and California state laws which indentured Indians and discriminated against them during the latter half of the 19th century resulted in wide geographic dispersal of tribal members. Therefore, for California Indian groups, the focus of the term should be on networks of social interaction between group members, regardless of territorial proximity, though the geographic proximity of members to one another and to any group settlement or settlements would still be a factor in determining whether a community exists. Moreover, as long as there is an existing community that can demonstrate descendancy from an Indian group that historically inhabited a specific area, it should suffice.

Finally, the requirement that a "predominant portion" of the membership of the petitioner comprise a community as defined is problematic. The Advisory Council recommends that a "substantial portion" be set as the standard. This standard reflects the unique problems created by wide geographic dispersal and dislocation of California Indian Groups.

3. **Technical assistance to complete the Federal Acknowledgment Process should be provided to those petitioning California tribes that have requested such assistance.**

**Discussion:** For the past 36 months the Advisory Council has provided state-wide leadership and a forum for tribes to communicate, assist each other and organize resources. It is necessary for this forum to continue. Re-authorization of the Advisory Council is one potential mechanism for ensuring ongoing leadership. A consortium of tribes with adequate funding would be another vehicle.

The lack of available funds to assist the California tribes in completing petitions and developing realistic economic plans is extremely alarming because the Task Force learned at the White House and national meetings of unacknowledged tribes, that other regions with far fewer tribes in need of completing the process have received far more financial support. In the last 36 months, the Recognition Task Force was given a budget of $25,000 to work on recognition issues and to finalize this report. With this modest sum, the Task

THE ACCIP FINAL REPORTS AND RECOMMENDATIONS    15

TO THE CONGRESS OF THE UNITED STATES PURSUANT TO PUBLIC LAW 102-416    Case 5:07-cv-02681-JF    Document 1-5    Filed 05/21/2007    Page 20 of 32

Force was able to organize educational meetings and workshops on legislation, attend and represent the California tribes at meetings, as well as gather information from the BAR and tribes to complete this report. This work is vital and is essential for the petitioning tribes of California, and should be supported by adequate funding.

At least $500,000 a year for the next 12 years should be appropriated for this technical assistance. Two aspects of assistance relative to the acknowledgment process should be provided: (1) assistance in completing the petition and review process, and (2) assistance in formulating realistic economic development plans upon acknowledgment.

4.  There needs to be a clear definition of California Indian for purposes of eligibility for all federal programs and services available to Indians based on their status as Indians. (See definition of "California Indian" at Section I(D), *supra*, at page 14.)

Case 5:07-cv-02681-JF     Document 1-5     Filed 05/21/2007     Page 21 of 32

## B.    The Report on Termination

**Summary:** The Termination Policy sought to end the special trust relationship between the United States and Indian people that had been the cornerstone of federal-Indian relations since the United States' earliest years. In light of the destitute living conditions of most California tribes, Congress intended termination of the trust relationship to take place only after specific services were provided to prepare them for the discontinuation of federal aid and supervision, and only after the affected tribe consented to termination. In practice, however, the Executive branch achieved tribal consent through misrepresentation and undue influence, and then terminated federal status without providing the preparatory services.

Despite the fact that the termination policy has been expressly repudiated by both Congress and the Executive branch, some California tribes remain "terminated." Moreover, those that have been restored have not received adequate federal assistance in reestablishing sovereign relations with the federal government, in strengthening their own governments, and in acquiring lands to replace those lost through termination. This report addresses the historical context of the termination policy and the lingering effects of termination on California Indians, and contains recommendations for remedying the continuing effects of this failed federal policy.

### Recommendations:

1. **Congress should enact comprehensive legislation establishing a process for the expedited restoration of the remaining terminated California tribes, including modification of the criteria used to evaluate requests for tribal restoration.**

**Discussion:** Though termination has not been the official policy of the federal government since 1970,[62] there has not been a single comprehensive piece of federal legislation to restore the remaining terminated California tribes. This is particularly striking in light of the fact that the federal government has lost or settled all of the California rancheria un-termination cases litigated over the past quarter century. Certainly, Congress has shown its awareness of the need for restoration of terminated tribes by passing at least 12 individual restoration bills between 1973 and 1990. It was not until 1993, however, that Congress finally acted to legislatively restore any terminated California tribes. The two tribes restored by Congress—the Paskenta Band of Nomlaki Indians and the United Auburn Indian Community—bring the total number of California tribes restored through litigation or legislation to 29.

Today, of the 38 California rancherias terminated under the Rancheria Act of 1958, nine remain terminated. Of these, at least three would meet the following criteria used by the Federal government in evaluating a terminated tribe's eligibility for restoration:

1. there exists an ongoing, identifiable community of Indians who are members of the formerly recognized tribe or who are their descendants;

2. the tribe is located in the vicinity of the former reservation [or rancheria or other lands set aside for their use];

3. the tribe has continued to perform self-governing functions either through elected representatives or in meetings of their general membership;

4. there is widespread use of their aboriginal language, customs and culture;

5. there has been a marked deterioration in their socioeconomic conditions since termination; and

6. their conditions are more severe than in adjacent rural areas or in
other comparable areas within the State.[63]

Generally, Criteria 5 and 6 have not been an issue in the restoration of terminated California tribes
because the effects of termination were so devastating, both economically and socially. Moreover, despite the
negative effects of termination on tribal organization and culture in California, most of California's terminated
tribes do not have trouble meeting Criteria 4. Criteria 1, 2 and 3, however, have proven the most difficult to
meet for tribes seeking restoration.

Criteria 2 and 3 should be modified or eliminated. Termination often resulted in the loss of land to
creditors and tax sales. Moreover, the former rancherias were often located in economically depressed areas,
and tribal members reasonably chose to move to more urbanized areas to seek employment. In addition,
termination removed two major factors that contributed to the political cohesiveness and function of the tribal
entity—tribal communal lands and the federal-tribal trust relationship. When the government distributed
tribal lands per capita and severed the trust relationship, the focus of the tribal community naturally shifted
from a communal self-governing function based on a common interest in tribal land and federal Indian
programs, to individual survival. Tribal relationships receded from formal self-governing functions required
by the common ownership of land and common interest in the benefits of the federal-tribal trust relationship
to more subtle, less formal, social, economic and religious interactions between tribal members. Thus,
requests for restoration of terminated California tribes should be evaluated under criteria that take account of
those factors inherent in the termination process which discouraged Indian people from remaining on their
former lands and removed the incentive for them to continue to maintain a formal governing structure.

2. Congress should appropriate funds to assist those terminated California
tribes seeking restoration.

**Discussion:** Terminated tribes seeking restoration must employ attorneys, anthropologists and other
experts to help them prove that they meet the government's criteria for restoration. To defray these and other
costs of the tribal restoration effort, terminated tribes usually turn to charities and select public agencies, such
as the Administration for Native Americans (ANA) and the State of California's Indian Assistance Program,
for seed money to begin the challenging process of initiating and coordinating the effort to restore tribal status
through litigation or legislative advocacy. Unlike unacknowledged tribes seeking federal recognition, the
terminated tribes have no access to technical assistance or support from the BIA. In essence, the tribes bear
the entire administrative and financial burden of reversing the effects of a policy that the federal government
itself now recognizes as misguided.

3. Congress should appropriate supplemental "Restored Tribes" funding
for newly restored California tribes.

**Discussion:** With respect to newly-restored tribes, the initial tasks faced by the tribes are the
development and adoption of comprehensive governing documents, obtaining funds for land acquisition and
essential tribal operations, and reestablishing a working partnership with the BIA and other federal agencies.
These essential tasks, which present problems to even well-established tribes, often threaten to overwhelm a
newly-restored tribe because of the lingering effects of termination. Without "Restored Tribes" or some other
form of supplemental funding, newly restored tribes often lack the means to establish and minimally staff a
tribal office as a base of tribal operations. Though the challenges of operating tribal programs and exploring
options for economic development are imposing even when funds are available, the difference is that, with
supplemental funding, the tribe possesses the financial means to begin developing the capacity to carry out
these self-governing functions.

The "Restored Tribes" funding would also be a gesture of good faith and a sound investment by
Congress in Indian tribes whose tenacity in seeking restoration will likely be replicated in pursuit of their
status and interests as self-governing entities.

Case 5:07-cv-02681-JF    Document 1-5    Filed 05/21/2007    Page 23 of 32

4. Congress should enact legislation (a) stating that it is the policy of the United States Government, in carrying out its public and other federal land management functions, to assist newly restored California tribes in identifying and acquiring public and other federal lands, which have been or may be classified as available for disposal under federal law, for the purpose of meeting tribal housing and economic development needs; and (b) directing federal agencies to consult with the tribes in identifying such public and other federal lands within or near the aboriginal territories of the tribes suitable for such purposes.

**Discussion:** The restored California tribes each have a very limited land base, or no land at all. The lack of an adequate land base is the primary limiting factor in the efforts of restored tribes to reconstitute their tribal governments, provide housing for tribal members, and develop local economies. Without the ability to acquire federal lands in trust, the primary means of funding tribal land acquisition for housing and economic development is the Department of Housing and Urban Development's Indian Community Development Block Grant Program. In the past, this program has given many California tribes the funding they needed to acquire small parcels of private land, primarily for housing. Its effectiveness today for this purpose is more limited. This is due to the increasingly tight restrictions that the Secretary of the Interior has placed on the fee-to-trust land acquisitions, coupled with the State of California's heightened scrutiny of fee-to-trust transfers because of their potential to give the tribes the means of engaging in gaming operations, which have proven to be a successful vehicle for tribal economic development. These factors have stalled tribal efforts to expand their limited land base and develop economically feasible operations capable of generating jobs for tribal members and revenues for provision of essential tribal governmental services, such as education, health care, housing, and reservation infrastructure improvements.

California tribes, especially those that have had their federally recognized status restored, need affirmative action by Congress to simplify the transfer of federal lands for the creation or expansion of tribal homelands. The current federal land acquisition regulations and policies are simply not adequate to address the immediate needs of these tribes or, for that matter, of most of California's recognized tribes. The restored tribes need a congressional remedy responsive to their unique situation, as well as that of the other landless or land-poor California tribes.

5. The Wilton Miwok Indian Community, the Federated Indians of the Graton Rancheria, and the Mishewal Wappo Tribe of Alexander Valley should be immediately restored by Congress. In addition, the other tribes that remain terminated should receive special consideration, according to criteria modified as recommended above, when they are ready to seek restoration.

**Discussion:** The Wilton Miwok Indian Community, the Federated Indians of the Graton Rancheria and the Mishewal Wappo Tribe of Alexander Valley meet the current criteria for restoration and should be immediately restored.

6. Congress should enact legislation declaring that it is the policy of the United States to not interfere with decisions regarding enrollment and eligibility criteria for restored tribes, and that no federal agency should try to influence a restored California tribe to limit its membership to persons listed on the distribution roll prepared pursuant to the Rancheria Act, and their descendants.

**Discussion:** In its advisory capacity to newly restored tribes, the BIA often urges the tribes to confine their membership to persons appearing on the distribution list prepared during termination, and their descendants. This advice interferes with the tribes' exclusive sovereign power to determine tribal membership, sows conflict among different groups of potential members, and ignores the fact that many tribal members were arbitrarily omitted from the distribution list in the first place. However, because the advice also serves to limit the scope of the BIA's trust responsibility, it is unlikely that the BIA will abandon this practice without legislative direction to do so.

## C.   The Community Services Report

**Summary:**  Studies conducted by federal, state and private agencies spanning almost a century have reached the same conclusion:  California Indians have not received their fair share of federal Indian program dollars and have been denied access to some programs provided to tribes in other Bureau of Indian Affairs (BIA) service areas.  As a result, California Indians in general have not attained the same level of development as other Indian groups.  The reports reaching this unanimous conclusion have come from both Republican and Democratic administrations, as well as from non-profit organizations.

The BIA funds different programs based on a variety of criteria.  Many programs, such as Tribal Priority Allocations (TPA), are funded each year based on historical funding levels.  Others are funded based on formulae that take into account eligibility requirements and other factors.  Still other programs, such as general welfare assistance and contract support, are based strictly on need.  Finally, some programs are funded on the basis of competitive grants.  When the BIA budget is viewed in terms of per capita expenditures, however, it becomes clear that all of the types of funding determinations have disadvantaged California Indians.

Inequity toward California Indians continues in BIA allocations for many programs, even when its own service population data are employed.  The degree of inequity is understated, however, because the BIA systematically undercounts California Indians by employing inappropriate criteria for counting its service population in California.  While no reliable count of California Indians has been conducted, all of the available figures indicate that the BIA severely undercounts the service population in California. For example, the 1990 Census figure for Indians living in the rural parts of California counties containing Indian reservations is slightly more than double the 1989 BIA service population figure for California.  Similarly, the 1997 IHS service population figure for California is more than double the 1995 BIA figure.  The IHS count of California Indians living in rural areas alone is substantially higher than the BIA service population for the entire state.  In fact, the number of California Indians that were certified to participate in the distribution of funds from the California Land Claims cases in 1972 is higher than the BIA's 1995 service population figure.  Thus, it appears that the service population would at least double if more appropriate criteria were applied to California Indians.  Accordingly, this report documents current inequities in federal allocations for California Indians by calculating per capita expenditures using not only the actual BIA service population statistics, but also the more appropriate figures that are approximately twice those employed by the BIA.

The history of federal policy toward California Indians affords insight into the weaknesses of the BIA's service population criteria.  In particular, the limitation of service population to members of recognized tribes is suspect in the context of California history.  In California, individuals who hold public domain or national forest allotments, and individuals who participated in claims awards based on the unratified California treaties can prove that the federal government views them as Indians, even though the BIA refuses to recognize their tribal groups.

In addition, the failure of the federal government to ratify the 18 California Indian treaties and to establish a suitable reservation land base for California's tribes undermines the rationale for applying the general criterion limiting service population to Indians "on or near reservation" in California.  For analogous reasons, this geographic criterion is currently not applied to Indians in Oklahoma and Alaska.  Early BIA reports document situations in which the members of small aboriginal bands of California Indians were granted allotments on the public domain in lieu of reservations or rancherias.[64]  These same groups were later ignored as tribal communities because of their individual, as opposed to communal, ownership of trust land.  In essence, the allotments served in lieu of a reservation or communal land base; however, the BIA later denied responsibility for recognition of the tribal group because it lacked any communal trust land.  Not only do some of these groups deserve to be recognized, their members are entitled to be counted as part of the BIA service population and therefore eligible for federal Indian programs and services.

While the BIA has since the mid-1980s moved toward a uniform criterion for eligibility for most of its programs—membership in a federally recognized tribe—Congress and other agencies of the federal government have begun to modify the eligibility criteria for some programs to include off-reservation Califor-

nia Indians and members of unacknowledged tribes. Illustrations include the IHS (administering broadly inclusive language from the 1988 amendments to the Indian Health Care Improvement Act) and the Department of Education's Indian Controlled Schools Enrichment Program, authorized by recent amendments to the Indian Education Act which exempt California, Oklahoma, and Alaska Indians from geographic criteria.

Budget data from the 1980s and 1990s confirms that the inequities have persisted. Using figures from the most comprehensive funding category—Operation of Indian Programs—and the BIA's official service population figures over the years 1990-95, it is apparent that California Indians receive only one-third to one-half the funding received by all other Indians. Similarly, funding from the IHS for California Indians is about 30-40% less than the national average over the period 1988 through 1995. Housing and Urban Development Indian Housing programs also show a systematic under-funding over the last decade.

The BIA also under-serves the Sacramento Area in administrative capacity as compared to other BIA areas. The area office serving California Indians has one of the lowest shares of BIA personnel and the smallest square footage of office space.

The effects of these documented inequities are manifest in the diminished social and economic welfare of California Indians relative to Indians elsewhere in the country. When compared to reservation Indians elsewhere, California Indians have higher rates of poverty, lower incomes, less education, and higher rates of non-unemployment. Only in household characteristics do California reservation Indians do better than non-California reservation Indians. These combined indices of social and economic conditions puts California reservation Indians among the lowest socioeconomic groups in Indian country. Since Indians are already among the poorest groups in the country, California Indians are among the most economically deprived groups in the nation. The past and present history of administrative neglect and under-funding has contributed to the social and economic conditions endured by California reservation Indians.

### Recommendations:

1. There needs to be a clear definition of California Indian for purposes of eligibility for all federal programs and services available to Indians based on their status as Indians. (See definition of "California Indian" at Section I(D), *supra*, at page 14.)

2. In appropriating and allocating budget funds for individual benefit programs, Congress and the BIA should increase amounts directed to the Sacramento Area Office to ensure that per capita spending for California at least equals the national per capita spending average for all areas of Indian country. Per capita spending for California should be calculated taking into account an Indian service population based on the definition of California Indian recommended above. In addition, Congress should pass legislation that ensures that the BIA, the IHS, the Department of Housing and Urban Development (HUD), and all other federal agencies are funding California Indian tribes at levels comparable to national averages for Indians.

3. Congress should appropriate, and the BIA allocate, the funds necessary to determine the number of California Indians eligible for General Assistance welfare benefits under the Snyder Act. All eligible individuals should be provided with these benefits in the next budget cycle.

**Discussion:** Although the Secretary of Health and Human Services was directed to determine the number of California Indians eligible for health care services provided by the IHS,[65] the Secretary has not done so. Thus, there is no reliable estimate of the number of California Indians eligible for Snyder Act programs.

4. Congress should appropriate, and the BIA allocate, adequate funds for the planning, establishment, and ongoing operation of tribal law enforcement and justice systems in California.

**Discussion:** Such law enforcement systems may take the form of individual tribal institutions, consortia, special-purpose entities, or contracts with state or local agencies. Particular attention should be given to support tribal initiatives in the areas of child welfare, environmental control, housing administration and evictions, and drug law enforcement. There should be no requirement that these systems resemble non-Indian law enforcement or judicial institutions, so long as they comply with applicable federal law. Once such tribal systems are established, they should receive BIA funding support at per capita levels that are at least equal to the average per capita funding for tribal law enforcement and justice systems outside of California. Per capita spending for California should be calculated taking into account the revised service population, based on the definition of California Indian recommended above.

5. Congress should enact legislation authorizing each California tribe to initiate retrocession of Public Law 280 jurisdiction from the State of California to the federal government, either in whole or in part. The legislation should establish a federal commitment to fund and provide technical support for the development of law enforcement and justice systems in California as recommended above. Furthermore, where Public Law 280 remains in effect, Congress should clarify those areas of tribal civil and criminal jurisdiction that remain concurrent with state jurisdiction.

6. The Congress and Executive Branch should recognize the disproportionate loss of aboriginal lands by California Indians and make special provisions to ensure that California tribes are not "penalized" for their small land bases in the formulation and application of federal funding formulas that include size of the tribal land base as a criterion for distribution of funds.

7. Congress should enact legislation establishing the necessary policy and legal framework to assist California tribes to acquire public and other federal lands for tribal homelands, housing, economic development, and cultural and natural resource protection. The legislation should (a) state that it is the policy of the United States Government, in carrying out its public and other federal land management functions, to assist California tribes, especially newly recognized and newly restored tribes, in identifying and acquiring public and other federal lands, which have been or may be classified as available for disposal under federal law; and (b) direct federal agencies to consult with the tribes in identifying such public and other federal lands—within or near the aboriginal territories of the tribes—suitable for such purposes. (See also Recommendation 4 of the Termination Report.)

**Discussion:** Many recognized California tribes have land bases that are inadequate to meet their immediate needs for housing and economic development. Some lack any land base whatsoever. Most newly recognized and newly restored tribes find themselves in the same situation. A land acquisition program is needed which specifically targets the land needs of currently recognized California tribes and anticipates the future acknowledgment or restoration of many currently non-recognized California tribes. Public or other federal lands could be identified through a tribal-agency consultation process and set-aside for specific tribal purposes.[66] Lands identified for transfer to the tribes should have economic development potential and reasonable access to water and roads.

Case 5:07-cv-02681-JF     Document 1-5     Filed 05/21/2007     Page 27 of 32

8.  The Secretary of the Interior should coordinate with Interior agencies and other cabinet level officers to develop a comprehensive approach for identification of public and other federal land that could be made available for disposal to California tribes for housing, economic development and cultural and natural resource protection purposes. (See also Recommendations 4 and 5 of the Economic Development Report.)

9.  Congress should authorize supplemental appropriations for the BIA, IHS and HUD to specifically target the needs of California Indians. These funds are justified as a long overdue remedial measure to address the severe socio-economic effects of decades of federal underfunding of Indian programs and services in California. These funds should be made to develop tribal administrative capacity and infrastructure, develop and fund program consortia for small tribes, and should be aimed at alleviating the chronic poverty, lack of housing, unemployment, and health service inequities suffered by California Indians. Target remedial funding levels should be indicated by adding shortfalls from the national average over recent historical time periods.

10. Congress should establish a base funding amount for needy small tribes in California for development of tribal governmental and administrative capacity.

## D. The Report on Economic Development

**Summary:** The prospect of economic development for most California tribes is grim. Although California Indian tribes consistently express their desire to develop economically in ways that are culturally appropriate and environmentally safe, very few opportunities exist to do so. One major obstacle is that most tribes in California have land bases that are too small to support business development, are usually isolated from business centers, and lack natural resources that can be put to commercial use.

The other major obstacle is that years of inequitable funding of tribal governments in California has left them without the administrative capability and infrastructure necessary for successful economic planning. The federal government's neglect has forced many California tribes to focus on basic issues of survival, rather than on the more practical issues associated with economic development. Thus, the majority of California tribal governing bodies are not experienced in management, preparation of business plans, organizational development, legal and physical infrastructure development, critical analysis of market opportunities and project feasibility, accessing capital for enterprise development, or labor force requirements.

This combination of obstacles has left the tribes with limited options. For those tribes located near large urban centers or recreation areas, gaming operations are an alternative because they require a relatively small capital investment compared to their profit and job-generation potential. But while gaming has provided the economic mechanism through which some California tribes have dramatically reduced poverty and unemployment on their reservations, California's hostility to Class III gaming operations and the resulting lack of tribal-state Class III gaming compacts, has jeopardized this area of federally-sanctioned tribal economic development. Also, some reservations with areas of open, unproductive land located near urban areas have become targets for private waste management companies seeking new locations for municipal and industrial waste disposal.

Both of these kinds of economic development are often perceived as "undesirable" either because of the nature of the economic activity or their potential to create adverse social and environmental effects. However, even when those effects have been adequately addressed by the tribe or, in appropriate circumstances, an involved federal agency, opposition to tribal development initiatives often continues.

The report's review of selected tribal case histories reveals that some federal activities have contributed to the economic well-being of tribes. First, the presence of IHS-contracted clinics has contributed to the development of the administrative capacity of contracting tribes. Second, the BIA's Area Credit Office has, in some cases, been able to facilitate access to managerial and technical expertise, as well as access to equity and debt financing for tribal ventures. This assistance was very valuable to the tribes that received it. Unfortunately, allocations of federal dollars to the BIA's economic development programs have declined dramatically since 1993 and tribes have found it extremely difficult or impossible to access loans for enterprise development, even when viable market opportunities have been identified, technical assistance has been available, and enterprise feasibility has been determined. Third, there was a tendency among California tribes—after years of struggling to develop alternative kinds of enterprise development and facing ever-increasing tribal unemployment and poverty rates—to turn to gaming, as sanctioned under the Indian Gaming Regulatory Act of 1988, as the most immediate source of relief. Yet, the viability of gaming as a primary means of achieving long-term tribal economic development is now in question because of the lack of any tribal-state compact for Class III gaming in California and the Supreme Court's recent decision foreclosing any tribal remedy against the State when it refuses to make good faith efforts to negotiate such a compact.[67] Still, it appears that until the market for casinos becomes inundated, a significant number of California tribes will turn to the gaming industry as their only viable alternative to the growing levels of reservation poverty and unemployment, and the trend towards further reductions in federal funding for Indian programs.

The report identifies legal obstacles to tribal economic development and suggests ways in which Congress can clarify tribal taxing and regulatory authority to remove them, thereby enhancing the tribes' ability to initiate

Case 5:07-cv-02681-JF    Document 1-5    Filed 05/21/2007    Page 29 of 32

and sustain economic development, and reap the full benefit from the use of reservation lands and resources. In addition, the report discusses various models for economic development, including the creation of a Tribal Homelands Private Investment Corporation, similar to the Overseas Private Investment Corporation, as a means of stimulating private investment in underdeveloped and developing tribal economies in California.

### Recommendations:

### General Policy Guidelines

1. Federal policy initiatives for Indian economic development in California must acknowledge and respond to the diverse and unique situations of Indians in California. Policy initiatives should not pit federally recognized tribes against unacknowledged tribes, unaffiliated Indians or the large urban Indian population.

2. Federal policy initiatives for Indian economic development in California must address the potential conflict between sovereignty and trust responsibility by accommodating tribal self-determination on the one hand and assuring that the federal trust responsibility is properly discharged on the other.

### Base Level Funding—Development of Tribal Capacity

3. There must be an immediate response to the needs of California tribes through a special appropriation of multi-year, base level funding to provide tribes with sufficient and stable funding to address basic governmental and programmatic infrastructure issues. Base level federal funding is necessary to develop tribal governmental capacity to initiate economic development and multiyear funding is critical to long-range tribal planning and attainment of economic development goals.

### Land Acquisition and Administration

4. The Secretary of the Interior should coordinate with Interior agencies and other cabinet level officers to develop a comprehensive approach for identification of public and other federal land that could be made available for disposal to California tribes for housing, economic development, and cultural and natural resource protection purposes. The policy should allow land management agencies to enter into three-party land transactions involving agencies, tribes and private landowners as a means of facilitating tribal acquisition of private lands located on or near reservations. If development of such a policy is not within the existing authority of the Secretaries, Congress should enact legislation providing authority for such transactions. (See also Recommendation 4 of the Termination Report; and Recommendation 7 of the Community Services Report.)

5. The Secretary of the Interior should work with the California tribes to develop a comprehensive tribal land acquisition program, similar to but more expansive than past initiatives under the Indian Reorganization Act (IRA) and other statutes. Emphasis should shift from isolated, non-productive parcels to lands that may provide viable economic development potentials.

**Discussion:** California tribes that were parties to the 18 treaties negotiated in 1851-52 would have retained 8.5 million acres of their aboriginal homelands had the treaties been honored by the Senate. When the Senate refused to ratify the treaties and Congress extinguished the California tribes' land claims in the California Land Claims Act of August 3, 1851,[68] the tribes lost claims to their entire aboriginal homeland, totaling more than 70,000,000 acres. Today, the tribal land base in California is just over 400,000 acres (about .6% of the aboriginal land base), with an additional 63,000 acres of land held in individual trust allotments. Given this history and the large number of impoverished, resource-poor tribes in California, even a modest program of land acquisition should have as its target a long-term goal of returning thousands of acres of public lands to tribal ownership.

6. Existing land acquisition programs, such as that administered by the Department of Housing and Urban Development (HUD), should be expanded and strengthened through interagency coordination and streamlining of the bureaucratic processes (e.g., by designating an agency official to coordinate BIA/IHS/HUD involvement). In addition, the existing formulas for determining grants should be revised so that they do not discriminate against small tribes.

7. The process for transfer of lands from fee-to-trust status needs to be facilitated in California by:

   a. legislative or regulatory reform to allow identification of "land consolidation areas" (perhaps corresponding to aboriginal territories or service areas) within which acquired lands may be treated as contiguous to reservations.

   b. a unitary, coordinated environmental review process.

   c. a comprehensive program to address land contamination issues, including environmental review requirements related to land acquisition and the procedures for assessing and resolving contaminant issues. The program should facilitate a process for transferring or donating to tribes private lands within Indian country that have undergone environmental cleanup.

## Off-Reservation Economic Opportunities

8. There is a need to explore tribal economic development opportunities that are not tied to a land base or restricted to Indian country. For example, a program should be developed to provide tax or other incentives for private businesses that promote Indian participation or commit to support tribal economic development by pursuing Indian training and employment goals. Given the inadequate and geographically dispersed land bases of California tribes, such programs should not be restricted to reservation lands, although reservation-based businesses might be given greater incentives.

## Expansion of Existing Programs/New Programs

9. Existing Indian economic development programs should be reauthorized and expanded. For example:

   a. The BIA Loan Guaranty Program and the administering Sacramento Area Credit Office should be funded at increased levels.

   b. The BIA should provide training and technical assistance in tribal

governance and political infrastructure development, particularly to newly recognized and restored tribes.

c. The BIA should strengthen enforcement of its federal trust responsibility in order to ensure the protection of natural resources held in trust (tribal and allotted). A mechanism for such enforcement might be the creation of a joint review board comprised of BIA, other federal, and tribal officials who would review plans for economic development activities that are opposed by tribal members on the basis of threats to cultural, environmental or physical health.

10. Congress should enact legislation creating a California Tribal Homelands Private Investment Corporation, similar to the existing Overseas Private Investment Corporation (OPIC), as a means of encouraging American, including Native American, private investment in underdeveloped and developing tribal economies in California through a program of direct loans and loan guarantees that provide medium- to long-term funding to ventures involving significant equity and/or management participation by American businesses.

### Technical Assistance—Building Tribal Capacity

11. Funding should be made available to support training of California tribes and individual tribal members in a broad range of technical areas, including but not limited to administrative capacity building, physical and social infrastructure development, strategic planning for business and economic development, marketing and business feasibility analysis, business plan development, business management, and federal and state laws relating to tribal economic development.

### Gaming

12. The Secretary of the Interior, pursuant to the federal trust responsibility, should promulgate regulations establishing a procedure to allow a tribe to engage in Class III gaming if a state fails or refuses to enter into good faith negotiations to conclude a tribal-state compact under the Indian Gaming Regulatory Act (IGRA).

13. Congress, in addition to or in the absence of Secretarial action to promulgate regulations providing a remedy to tribes under the IGRA when a state fails to negotiate in good faith, should amend the IGRA to establish a fixed time period, once a tribe initiates discussion with a state on a Class III gaming compact, in which to conclude the compact, but if a compact is not concluded despite the good faith efforts of the tribe within the statutory time period (e.g., 90 or 180 days), the tribe should be able to go directly to the Secretary of the Interior for approval of its Class III gaming operation.

**Discussion:** California has a long and ugly history of opposition to any form of tribal sovereignty. From the initial decision of the State Legislature in 1852 to oppose Senate ratification of the 18 Indian treaties negotiated by federal commissioners, and the State's resulting genocidal policies of enslavement and "extermination" of the Indian population, to the modern-day opposition to the exercise of reserved Indian fishing rights and tribal regulatory and taxing authority, California has demonstrated its hostility to tribal sovereign authority and the continued efforts of the indigenous peoples of California to chart their own political and economic destiny. Thus, the good faith negotiations that Congress envisioned would occur between the tribes and the States under IGRA immediately encountered the institutional hostility of California

to tribal sovereignty. IGRA anticipated this problem and provided a federal court remedy where a state refuses or fails to engage in good faith negotiations initiated by a tribe. This remedy, however, disappeared with the Supreme Court's decision in *Seminole Tribe of Florida v. Florida*, 116 S. Ct. 1114, 134 L.Ed.2d 252 (1996), leaving the states free to flaunt the good faith provisions of IGRA without sanction.[69] California has taken full advantage of its immunity by resisting good faith efforts by the gaming tribes of California to conclude tribal-state compacts on Class III gaming operations. In short, the Congressional compromise of tribal jurisdiction reflected in the IGRA has not worked in California.

What are the alternatives? One would be for Congress to specifically amend the IGRA to eliminate the States' participation—through the mechanism of compacting—in the Class III approval process. In other words, to return to the "bright line" aspect of the *Cabazon* decision[70] modified only by a process of Secretarial review and approval similar to that which exists in the IGRA.[71] Such an amendment would probably not succeed because the compacting process has worked in other states and because the States would undoubtedly oppose any process that foreclosed their involvement in decisions on Class III gaming. A more realistic and acceptable alternative for both States and tribes would be to amend the IGRA to establish a fixed time period for a tribe and a state to conclude a compact on Class III gaming once the tribe has initiated the process. Then, if a compact is not concluded despite the good faith efforts of the tribe within the statutory time period (e.g., 90 or 180 days), the tribe should be able to go directly to the Secretary of the Interior for approval of its Class III gaming operation in accordance with applicable statutory or regulatory criteria. Certainly, such an alternative would reinstill the process with the elements of state accountability and fair dealing that Congress originally intended in passing the IGRA, but which *Seminole* undermined through its broad interpretation of the States' Eleventh Amendment immunity.

## Tribal Jurisdiction

14. Congress should enact legislation recognizing that tribal governmental powers are coextensive with the boundaries of the tribe's reservation, and that the tribe's powers are exclusive on Indian lands within the reservation boundaries and concurrent on non-Indian lands. The legislation should expressly preempt the imposition of a state possessory interest tax on non-Indian lessees of Indian trust lands within reservation boundaries.

The Supreme Court's decisions in Brendale[72] and Yakima[73] substantially undermined tribal taxing, planning and regulatory authority. Those decisions allow states to reach into the territories of sovereign tribes to implement potentially conflicting zoning and land use policies on non-Indian lands, and to derive tax revenues from Indian-owned fee lands. The approach recommended above emphasizes the "territorial" aspect of Indian sovereignty by focusing the determination of jurisdiction on the "Indian country" status of the area rather than the trust or fee status of individual parcels.