# EXHIBIT K

## PART 2

## E.    The Report on Trust and Natural Resources

**Summary:** The trust relationship between the United States and Indian peoples pervades all areas of Indian law. It is both a source of federal power over Indians, and a substantive limit on that power. It requires the federal government to deal with the Indians in good faith. Moreover, treaties, statutes and other federal actions create specific fiduciary duties, enforceable in the federal courts through actions for declaratory and injunctive relief and, in appropriate cases, money damages.

The BIA interprets its trust responsibility narrowly, both in defining what duties are owed and the class of Indians entitled to the benefits of trust protection. Even though contradicted by its own past actions, the BIA currently takes the position that only federally-recognized tribes and their members are entitled to participate in federal programs and services for Indians. Moreover, the BIA defines "federally recognized" as applying to only those tribes listed pursuant to 25 C.F.R. Part 83, even in cases where contrary evidence demonstrates previous acknowledgment and lack of termination by Congress. These agency interpretations of the scope of the federal trust responsibility have a disproportionate impact in California because of the large number of unacknowledged tribes in the state.

One of the most important trust duties is the duty of the federal trustee to protect the Indian land base and its resources and, in appropriate situations, to administer the lands and resources for the benefit of the Indians. The BIA has not met this responsibility in California. One reason for this is that the BIA has not maintained current, comprehensive data on the Indian land and natural resource base in California. In addition, the lack of skilled personnel, especially natural resource experts, at both BIA Sacramento Area and California Agency levels, precludes any regular and systematic collection of data on natural resources and severely restricts the availability of technical assistance needed to assist California tribes in their efforts to protect and manage trust resources.

Despite these problems, California tribes have demonstrated remarkable initiative in attempting to address environmental and natural resource protection and management issues. The report discusses a few of those tribal initiatives.

In light of the essential role that water has played in the development of Indian lands, especially in the arid Southwest, the report devotes a special section to the discussion of Indian water resources in California and the problems, both immediate and anticipated, associated with the lack of any systematic approach to inventorying and documenting tribal water rights in California. Another section of the report is devoted to the complex process for acquisition of land in trust status. While fraught with problems, pitfalls, and delays, the fee-to-trust process is nevertheless of acute importance to the California tribes, many of whom lack home-lands or have homelands of insufficient size to undertake economic development.

### Recommendations:

### Trust Responsibility—Equity

1.  There needs to be a clear definition of California Indian for purposes of eligibility for all federal programs and services available to Indians based on their status as Indians. (<u>See</u> definition of "California Indian" at Section I(D), *supra*, at page 19.)

2.  Congress should appropriate appropriate base level funding for all of California's federally recognized tribes for the development and support of tribal planning and administrative capacity, including plans with natural resource protection and land use components.

**Discussion:** One of the most well-documented conclusions gleaned from the BIA's own records and reports is that California Indians have consistently been allocated less than their fair share of federal Indian programs and program dollars. As a result, California tribes have received and continue to receive disproportionately lower levels of benefits and services from the BIA relative to other areas of the country. This lack of equitable and adequate funding and services has prevented the BIA from properly discharging its trust obligations, and has crippled tribal efforts to protect and manage natural resources. Base level funding for tribes in California is essential to close this institutional gap in federal funding and services, and to assist the tribes in developing and enhancing their own capacities for natural resource protection and management.

3. As part of their trust responsibility, federal land management agencies should be required to develop protocols outlining a procedure for consultation with California Indian tribes before authorizing activities that might adversely impact nearby or adjoining tribal lands.

**Discussion:** Currently, the Bureau of Land Management and the United States Forest Service are required to consult with appropriate Indian tribes only when the approval of leases and permits, or other activities will adversely affect the tribe's use of the federal lands.[74] These agencies should also be required to engage in meaningful consultation with tribes prior to allowing activities on federal lands that might adversely impact tribal lands.

4. The federally recognized status of the Koi Nation of the Lower Lake Rancheria should be immediately clarified by the Assistant Secretary of Indian Affairs. In the absence of any action by the Secretary, Congress should enact legislation clarifying that the Koi Nation of the Lower Lake Rancheria continues to be federally recognized.

**Discussion:** The Koi Nation of the Lower Lake Rancheria is a federally recognized tribe, as evidenced by previous acquisition of land in trust for the Tribe's benefit, as well as the Tribe's participation in an IRA election. The Tribe has never been terminated, but was never included on the list of federally recognized tribes updated periodically in 25 C.F.R. Part 83. Because of the Tribe's wrongful omission from this list, it is now prevented from effectively exercising its powers of self-government, and members are unable to obtain federal benefits and services available to Indians based on their status as Indians.

## Water Resources

5. The Department of the Interior should compile and consolidate existing data on Indian water resources in California and assist the California tribes in preparing current inventories of their water resources. In appropriate situations, the Department should assist the tribes in quantifying their water rights. Congress should appropriate funds for this purpose.

**Discussion:** The first step in protecting a tribe's water rights is the preparation of a water resource inventory. This preliminary action has not been taken for most tribes in California. Thus, the tribes' reserved water rights are jeopardized by competing uses. This situation also hinders reservation housing and business developments that require water.

6. Congress should clarify that tribes can temporarily market or lease their water rights to off-reservation users.

**Discussion:** Officials of the Department of the Interior have taken the position that water is a trust asset that cannot be sold without the permission of Congress pursuant to the Non-Intercourse Act. Given this position, Congress should clarify that any tribe can market their water resources during periods in which a tribe does not need or cannot use all of the water to which it is entitled.

Land Acquisition and Administration (See Recommendations in Community Services, Termination and Economic Development Reports.)

## Public Domain Trust Allotments

7.  Congress should appropriate funds to address the needs of the Indian owners of public domain trust allotments. This would include funding for land surveys to resolve boundary disputes, to quiet title to easements established by prescriptive use, and to enjoin trespass to the land and to resources, such as minerals and timber. Congress should clarify that all owners of public domain trust allotments are eligible for these services, whether or not they belong to a federally recognized tribe.

8.  As part of its trust responsibility, the Department should establish priorities for conducting water resource inventories—including surface and subsurface water sources—of public domain trust allotments in California and, where necessary, quantify the allotment's reserved water right. Congress should appropriate funds for this purpose.

9.  Congress should appropriate funds for creation of a special position or positions within the Sacramento Area Office charged with the following responsibilities: gathering data related to preparation of allotment resource inventories; exercising allotment rights protection authority (e.g., in quiet title, trespass and boundary dispute matters); leasing and permitting activities involving allotment resources; and developing a public information program that would inform public domain allottees of their rights and responsibilities with respect to the lands held in trust on their behalf by the United States.

## F.    The Report on Indian Education

**Summary:** Indian people and tribes in California have long recognized and continue to recognize the importance and power of education. Education is inextricably linked to the survival of Indian people and tribal communities at every level. For the individual, education is the source of his or her upliftment and future prosperity, through the acknowledgment of cultural identity and through the acquisition of skills of trade or profession. For the tribe or Indian community collectively, education is the source of continuing cultural vitality, resiliency and group prosperity as members of the community contribute to the growth and change of tribal and community life. But these positive benefits of education cannot be realized by California Indians unless the barriers blocking the effectiveness of Indian education efforts in California are removed.

The problem areas have been identified and documented in this report. They are generally grouped into four broad categories: the lack of California Indian control, the lack of inclusion of California Indian culture and perspective, overly restrictive eligibility criteria, and the lack of equitable funding. The root cause of these problems is the historical and ongoing discrimination by the BIA against California Indians and tribes and the failure of the federal government to adequately tailor programs and services to meet the unique needs of California Indians in those programs not involving the BIA.

In effect, California Indians are still contending with assimilationist practices, even though the federal policy of assimilation as a guiding principle for the relationship between the federal government and the Indian tribes was discredited and abandoned long ago. The fact is that the policy of Indian self-determination in education, as in other areas, has never been implemented in California in a tangible way. Consequently, those programs and services designed to achieve the goals of self-determination and to uphold a government-to-government relationship between the federal government and the tribes of California have little or no effect in practical terms. Meanwhile, the vast majority of California Indian children continue to languish within a public school system that institutionally invalidates them. It is precisely because most Indian children and adults in California never achieve their educational potential, that the promise of Indian self-determination in education must finally become a reality in California.

In the areas of higher, adult and vocational education, where Congress has provided at least some programmatic and funding tools for Indians to progress into skilled and professional positions, the policies of the BIA have short-circuited the opportunities for many California Indians. In these programs, the overarching issues of equity funding and individual eligibility for BIA programs are most clearly evident. Thousands of California Indians have been denied access to these education programs by administrative fiat implemented in violation of federal law.[75] Even those California Indians who have not been denied services through the BIA's arbitrary attempt to redefine the California Indian service population are nevertheless denied adequate educational funding and support because the BIA continues to allocate to California Indians less than their fair share of the Indian education budget. More recently, the BIA has used the budget allocation process to foreclose program eligibility for all California Indians who are not members of federally recognized tribes. By moving all Indian education programs into its Tribal Priority Allocation method of dividing up program funding, the BIA effectively allocates all education funding to California's federally recognized tribes without regard to the Snyder Act's broad mandate to provide education assistance to "Indians throughout the United States."[76]

The most successful educational projects and initiatives in California have been those that have placed control of education programs with parents and tribes at the local level. This includes the Noli School located on the Soboba Reservation, the Four Winds Charter School in Chico, and the formulation of the United Tribes Education Coalition (UTEC) to advocate on behalf of Indian children and parents and to address a myriad of problems in several local public school districts serving the children of multiple tribes. As these few examples illustrate, approaches in California are varied, but they are affected by many of the same issues: tribal control and the concomitant need for tribal infrastructure development, eligibility requirements and funding. The greatest single reason for the lack of success and unpopularity of BIA programs has been that they have failed to involve Indians in their planning and implementation.

As presented in the recommendations herein, a joint study must be conducted to devise a plan to develop this new tribally controlled system of education. The study should focus at the local and tribal levels, not merely at the state level. Tribes and unrecognized California Indians have to this point worked with the existing local school systems and, in some cases, have had some measure of success. These efforts should not be disrupted but should be complemented in the proposed study—by applauding local efforts to work together, and by providing answers to problems that have prevented continued growth. In areas where there has been greater conflict, this process should be an opportunity to address issues in a positive environment which stimulates creation of new options not previously available.

Each of the Advisory Council's recommendations is aimed at assisting Congress in formulating thoughtful approaches tailored to meet the needs of California Indians in the area of education. In order to translate these recommendations into successful programs, the suggested approaches must be backed by funding commitments from both Congress and the BIA. Congress must make the necessary appropriations and the BIA must ensure that the funds are made available promptly and in a manner consistent with effective program implementation. Without adequate funding, even the most carefully crafted programs are unlikely to succeed. Historically, California Indians and tribes have suffered from both failings, inadequate program development and inadequate funding. Nevertheless, they have retained the vision that Indian education in the State of California may one day enable individuals and Indian communities and tribes to reach their ultimate potential. It is well past time, as we approach the twenty-first century, to attain that vision.

## General Recommendations

1. There needs to be a clear definition of California Indian for purposes of eligibility for all federal programs and services available to Indians based on their status as Indians. (See definition of "California Indian" at Section I(D), *supra*, at page 14.)

2. Create a grant program for the development of curricula for use in tribally-controlled or public schools, which fully integrates California tribal histories, languages and cultural perspectives. The entities eligible for the grants would be tribes (both recognized and unrecognized), consortia of tribes, Indian organizations, and collaborative projects between tribes and Indian organizations and school districts. School districts would be ineligible to apply on their own.

3. Enact legislation authorizing the establishment of a joint federal/state/ tribal team to study, devise and implement a plan to coordinate comprehensive delivery of services among the 27 State of California Indian Education Centers and the BIA's tribally-controlled school programs. The study would address issues concerning (a) the establishment of tribally-controlled schools, possibly utilizing the facilities and resources of those state Indian Centers already established on or near reservations, and (b) the potential for utilizing some state centers as regional technical assistance centers for Indian-specific programs.

Recommendations made under the joint study should be implemented with final decision-making authority in the hands of tribes in consultation with Indian educators and administrators. This will ensure that tribally-controlled schools and Indian Education Centers are designed to address the educational needs of those tribes and the local Indian community.

## Program Specific Recommendations

## Bureau of Indian Affairs Programs and Services:

### Sherman Indian High School

4. Enact legislation mandating that the management and administration of Sherman Indian High School be turned over to California Indians.

5. Enact legislation setting forth enrollment eligibility criteria specifically for California Indian students attending BIA-controlled day schools and boarding schools consistent with the definition of California Indian recommended above.

6. In the same legislation, enact provisions which explicitly allow for BIA-controlled day schools and boarding schools to receive funding for eligible California Indian students based on the new enrollment criteria. This will require amending 25 U.S.C. 20007(f) to define "eligible Indian student" to include a California-specific provision consistent with the definition of California Indian recommended above.

### Tribally-Controlled Contract Schools

7. Enact legislation exempting California from the prohibition of new school start-ups contained in the 1995 Department of the Interior Appropriations Act. Enact legislation specifically authorizing establishment of day schools and boarding schools in California under contract with California tribes, consortia of tribes and Indian organizations serving California Indian children.

8. Increase federal appropriations and BIA allocation of funding for such schools so that per capita spending for California at least equals national per capita expenditures. Per capita spending for California should be calculated using a method for determining service population based on the definition of California Indian recommended above.

### Johnson O'Malley (JOM)

9. The BIA distribution formula under the Tribal Priority Allocation (TPA) system for JOM monies should be reexamined by Congress and the BIA, in consultation with California tribes. An alternate funding and distribution method for California should be specified by legislation or regulation, in which:

    a. Base level funding for California JOM programs would be determined according to a student count using the definition of California Indian recommended above.

    b. Specific program monies would be distributed on the basis of actual counts of students to be served by the programs.

    c. There would be express language indicating that the FY 1995 cut off does not apply in California.

d. There would be a provision specifying that any California JOM monies not contracted for in a particular year would be added to funds available for tribally-controlled contract school start-ups in California.

**Discussion:** The BIA should reconsider the distribution formula for TPA-JOM funds because: (a) it locks in a pattern of inequitable funding; (b) it excludes California Indians who are eligible for education programs authorized by the Snyder Act, but are not members of federally recognized tribes; (c) it disadvantages small tribes; and (d) the transfer disregarded the overwhelming opposition from California Indian tribes and individuals.

## Tribally-Controlled Community Colleges

10. Congress and the BIA should allocate planning grants for at least two new tribally-controlled community colleges in California.

11. Increase BIA funding for existing tribally-controlled community colleges in California even as new colleges are established, so that per capita spending for California at least equals national per capita expenditures. Per capita spending for California should be calculated using a method for determining service population based on the definition of California Indian recommended above.

## Higher Education Scholarships

12. Enact legislation directing the BIA to revise its eligibility criteria for higher education scholarships so that all California Indians who meet the definition of California Indian recommended above are also eligible for the scholarships. These eligibility criteria should also be revised to clarify that California Indians need not reside "on or near" a reservation in order to qualify for such scholarships. In addition, the legislation should be retroactive, and provide that California Indians who were denied higher education scholarships in the past be reimbursed for educational loans, or be eligible for loan forgiveness.

13. Increase BIA funding for scholarships to California Indians so that per capita spending for California approximates national per capita expenditures. Per capita spending for California should be calculated using population figures based on the definition of California Indian recommended above.

## U.S. Department of Education Programs and Services:

## Formula Grant Program (Title IX, Subpart I)

14. Implement federal regulations that define the "establishment" of an Indian parent committee to mean the "consistent functioning of the committee during the previous year." The regulations should specify that if such a committee fails to function consistently, the tribal application option is triggered. Evidence of the consistent functioning of the committee would be regular meetings and regular majority Indian parent membership on the committee.

15. Implement federal regulations modeled after the pre-1984 regulations which provide detailed language regarding access to documents, needs assessment, evaluation, hiring, responsibilities of the Local Education Agency (LEA) and parent committee, and composition of the parent committee.

## Special Programs and Projects to Improve Educational Opportunities for Indian Children (Title IX, Subpart 2) and Special Programs Relating to Adult Education for Indians (Title IX, Subpart 3)

16. Fully appropriate Title IX, Subpart 2 and 3 programs, with any funding formula to include California-specific provisions that ensure per capita spending that at least approximates national per capita expenditure for all programs.

17. The funding formula should also include the option that tribes may devise consortia or intertribal associations to apply for and administer such funds, or that they may apply separately and later combine funds and administer the programs jointly.

### Impact Aid

18. Enact legislation amending 20 U.S.C. § 7701 *et seq.* and providing direction for revised implementing regulations in the following categories as specified:

#### a. Local Educational Agency Eligibility

Provide for exemption of public school districts in California from eligibility requirements dealing with minimum numbers of federally connected children (i.e. more than 400 or at least 3% of student enrollment.)

#### b. Application for Payment

Require joint application by tribe(s) and school district(s), requiring joint signature by tribal government representative(s) and the district superintendent. Alternatively, require tribal approval and sign-off on the Annual Impact Aid application submitted by the district to the federal government.

#### c. Payment

Provide for payment of funds to either the tribe(s) or the district, with release of funds dependent upon joint signature by both tribal and district representatives. Provide for notification of funding to both the tribe(s) and the district.

#### d. Tribal Option to Remove Children and Contract for Services

Provide for a tribal option prior to proceeding through the complaint process to remove all or a portion of its children from the public schools and apply directly for Impact Aid monies to provide educational services for those children. Impact Aid funds would be made available to tribes for all children residing on the reservation who choose to attend the tribal school (regardless of affiliation with the tribe) through the BIA tribally-controlled school program. Provide tribe(s) the option to gradually phase in a tribally-

controlled school program by allowing tribe(s) to apply for funds on a periodic basis, as the children are removed from the public school or choose to attend the tribal school.

**e. Indian Policies and Procedures**

Provide for specific requirements in the district's Indian Policies and Procedures which restore former federal regulation provisions regarding meaningful Indian input.

Define meaning of "equal participation of Indian children" such that it is understood to include qualitative outcomes (achievement of grade level goals, test scores, grade point averages, dropout rates, enrollment in college preparation classes, graduation rates, alternative assessment outcomes, etc.) of Indian students in comparison to non-Indian students.

Define meaning of data and program information that must be provided to parents and tribes such that it encompasses and is coordinated with the collection and disaggregation of data referenced in Title I of the Improving America's Schools Act.

**f. Federal Reporting**

Provide for reporting by the school district to the federal government concerning the equal participation of Indian children, as well as program financial information.

## Regional Assistance Centers

19. Develop federal regulations, consistent with 20 U.S.C. § 8621(b), which require the two California Regional Assistance Centers to establish positions for Indian education program specialists, with the following duties:

    a. To disseminate to tribes, on an ongoing basis, information about all federal and state grant programs available to serve Indian children and adults, including higher education financial aid services for California Indians.

    b. To provide Indian parents with information and training regarding the function and role of Indian parent committees under various programs, as well as technical assistance for the proper functioning of the committees.

## Bilingual Education, Language Enhancement and Language Acquisition Programs

20. Enact legislation amending Title VII of the Improving America's Schools Act, 20 U.S.C. § 7404, to include unrecognized or unacknowledged California tribes, Indian organizations or consortia of tribes, and Indian organizations in the list of Native American entities eligible for the program.

## G.   The Report on California Indian Cultural Preservation

**Summary:** The following are essential principles which pervaded the entirety of the testimony and input offered in support of this report. These principles are fundamental to a discussion of cultural and religious practices of California Indians:

— Significant components of Indian religious and cultural practices in California are land-based.

— Particular sites are of religious significance since time immemorial and continue to be used contemporaneously to the fullest extent possible.

— Many cultural practices are tied to the land and natural resources of a geographic area.

— Native value systems are religion-based, so all aspects of native life carry religious overtones, including hunting, fishing, gathering practices, and child welfare.

— California Indians continue to maintain oral traditions and ceremonial practices that reflect native religions. During the course of these hearings, speaker after speaker shared current practices and discussed the extent to which traditions and cultural practices have survived and are reemerging despite centuries of assault and hostile government policies.

— There is tremendous diversity among native groups in California, facilitated by a cross-tribal tradition of tolerance and acceptance.

— California has a unique history, including the experience with unratified treaties and the California Land Claims cases, which established that "unrecognized" aboriginal Indians in California are identifiably Indian, and are legally and morally entitled to religious and cultural rights and protections.

— The violent and dishonorable treatment of California Indians— as reflected in federal law, policy and practice—has resulted in large numbers of landless, widely dispersed Indians. This calls for the development of innovative, community-based approaches to protect the cultural and religious practices of California Indians.

### Recommendations:

The following recommendations of the Advisory Council are based upon: (a) oral and written testimony collected over the past year and a half, (b) input from a diverse group of individuals who contributed to the development of this report, and (c) the findings and conclusions contained herein. The recommendations are not intended to be all-encompassing remedies to the problems facing the preservation of California Indian cultures. Rather, they are offered as starting points for a rudimentary good faith effort by Congress to acknowledge its moral and legal responsibility to protect and aid Indian tribes.

Case 5:07-cv-02681-JF     Document 1-6     Filed 05/21/2007     Page 12 of 27

## Recommendations for Congress

1. For California Indians not affiliated with a "recognized" tribe listed pursuant to 25 C.F.R. Part 83, it is recommended that Congress (a) facilitate immediate Part 83 recognition for petitioning California tribal groups (see Recommendation 1 of the Recognition Report), and (b) strengthen service delivery for California Indian people by adopting the definition of "California Indian" stated in Section I(D), *supra*, at page 19.)

**Discussion:** As Congress has recognized by enacting cultural protection legislation, there is a compelling need to preserve Indian families and their cultural and religious practices. California Indians, even those not affiliated with a Part 83 tribe, should benefit from the cultural protection legislation already enacted by Congress, including the Indian Child Welfare Act (ICWA) and laws protecting the practice of Indian religions.

2. Given the unique circumstances of California Indians, creative initiatives should be pursued to increase access to private lands, such as tax incentives and immunity from liability, for private property owners who make land accessible for Indian cultural and ceremonial use.

3. The American Indian Religious Freedom Act should be amended to provide a cause of action to tribes and Indian practitioners, so that they can enforce the substantive provisions in the law and protect their religious and cultural interests.

4. Congress should amend the National Historic Preservation Act to:

   a. Provide for the development and implementation, following appropriate consultation with tribes, tribal organizations, and traditional cultural leaders, of uniform government-wide consultation requirements for all federal agencies when an agency's proposed undertaking, including any developments that are reasonably foreseeable as a result of the undertaking, may have effects or adverse effects on properties of traditional religious and cultural importance to Indians, that are included, or may be eligible for inclusion, on the National Register of Historic Places. The government-wide consultation requirements should take into consideration the differing cultural practices and norms of Indians. Possible models for these consultation requirements include the Bureau of Land Management Native American consultation requirements. Traditional cultural leaders should be involved in all consultations regarding properties of traditional religious and cultural significance to Indians.

**Discussion:** Presently, there are a variety of consultation guidelines throughout the federal government. These guidelines are not consistent and frequently are inadequate to deal with the unique issues facing Native Americans. Although the Department of the Interior Office of American Indian Trust will in the near future publish its proposed guidelines for compliance with the Executive Order on Sacred Sites, there is no assurance that agencies other than Interior will adopt the same guidelines. This balkanization of practices and guidelines can only deter, rather than support consultation. Native Americans become frustrated, to say the least, with all of the varying requirements. Uniform consultation requirements would provide all parties with the assurance that the consultation process will take place in the same manner with all agencies. Thus, patterns of conduct and consultation precedents can be developed which can only help in further refining the process.

Consultation with traditional cultural leaders already is required under the National Historic Preservation Act (NHPA) Section 1069 Regulations [see 36 C.F.R. 800.1(c)(2)(iii)]. The regulation does not limit the participation only to traditional cultural leaders from recognized federal tribes. Traditional cultural leaders often are the most important source of information and guidance on culturally significant properties. Their exclusion can only lead to ill-formed decisions which could have a drastic adverse effect on such properties. The regulations already have recognized the value of traditional cultural leaders in Section 106 consultations and that value should be codified to assure compliance.

> **b. The definition of "federal undertaking" should be amended to include reasonably foreseeable projects arising out of, or as a result of, the proposed activities or activity.**

**Discussion:** Presently, the term "federal undertaking" in the NHPA is narrowly and arguably defined so as to include only the project or activity itself [see NHPA Section 301(7)]. Frequently, federally funded or permitted projects are not completed in a vacuum. Rather, the federal project is tied to the development of other projects, some other public lands or even private land. These additional projects would not occur without the federal project. The development of the related projects can, and often does, increase the potential effects and adverse effects of the federal undertaking on properties of traditional religious and cultural value. Accordingly, the definition should be amended to include reasonably foreseeable projects arising out of, or as a result of, the federal undertaking.

> **c. Federal agencies should consult with Indian tribes and organizations, including traditional cultural leaders, at the earliest possible stage of a federal undertaking. Such consultations should not only follow the uniform government consultation requirements (see above), but also National Register Bulletin No. 38. The federal agencies should also take into consideration the limited resources of many tribes and organizations and adjust their consultations to accommodate those limited resources.**

**Discussion:** Presently, federal law requires that a Section 106 review take place "prior to the approval of the expenditure of any federal funds on the undertaking or prior to the issuance of any license." [NHPA Section 106.] Federal implementing regulations further require that the "Agency Official should ensure that the Section 106 process is initiated early in the planning stages of the undertaking, when the widest feasible range of alternatives is open for consideration." [36 C.F.R. 800.3(c)]. Codification of the "earliest point in the planning process" requirement will further enforce the statutory requirement that federal agencies not wait, as they often do, until virtually the last minute to comply with Section 106.

National Register Bulletin No. 38 sets forth the National Park Service's guidelines on consideration of traditional cultural properties for nomination or eligibility to the National Register of Historic Places. Even though these guidelines are very thorough and useful, they are seldom followed. Unfortunately, the guidelines do not meet the status of regulations; however, some federal courts have cited the guidelines favorably in their decisions with regard to the Section 106 process. Giving the guidelines statutory or regulatory authority would provide for uniform government consultation requirements, and more uniform standards for other Section 106 responsibilities, such as the investigation and evaluation of traditional and cultural properties.

> **d. Where any federal agency determines, following consultation with Indian tribes and organizations, including traditional cultural leaders, that a federal undertaking, including reasonably foreseeable related projects, will have an adverse effect on properties of traditional religious and cultural importance to Indian tribes, organizations or traditional cultural leaders, the federal agency in consultation with the Advisory Council on Historic Preservation and the State Historic Preservation Officer will, in seeking ways to avoid or reduce the effects, prefer preservation of the property(ies) over its partial or complete destruction. The federal agency will only permit**

Case 3:07-cv-02681-JF    Document 1-6    Filed 05/21/2007    Page 14 of 27

partial or complete destruction of a property of traditional religious and cultural importance after the agency has determined that there is no other reasonable and feasible alternative to the partial or complete destruction.

**Discussion:** The requirement of no reasonable and feasible alternative already is well known in federal and state law. For example, the Federal Transportation Act, Section 4(f), contains the same requirement with regard to the construction of highways through national monuments or parks. Its inclusion here will serve to enforce the standard that traditional cultural properties should be considered as important as other culturally significant properties.

5. Congress, in the exercise of its trust responsibility, should provide tribes with the tools to protect their resources, by acknowledging and protecting in-stream use of water for maintenance of Indian fisheries and the integrity of reservation watersheds.

6. All California Indians, as defined in Section I(D), *supra*, at page 14, should be exempted from laws limiting the taking, use and possession of items used for religious and ceremonial purposes, such as feathers from eagles and migratory birds, and animal parts from native wildlife species. If exemptions cannot be granted, accommodations must be fashioned to eliminate the criminalization of the taking and possession of religious artifacts and ceremonial regalia.

7. Congress should amend the Native American Graves Protection and Repatriation Act (NAGPRA) to:

   a. accommodate claims involving tribes with diverse and mixed historical tribal affiliations, as well as the claims of unacknowledged and terminated groups;

   b. change the priority for repatriation from individual lineal descendants to culturally affiliated tribes; and

   c. establish and fund a centralized California Indian Repatriation Center to disseminate repatriation information, document current excavation, and assist tribes through a grant program to cover costs of repatriating human remains, associated items and objects of cultural patrimony. The Center would not have authority to petition for repatriation of items, but would facilitate implementation of NAGPRA in California.

**Discussion:** Both NAGPRA and the California State Native American Heritage Commission give priority to lineal descendants for repatriation requests. Documentation from individual tribal members regarding the most likely descendant or lineal descendent criteria is difficult, if not impossible, to establish. This difficulty is compounded by the inconsistencies between federal requirements and state recording practices, adoptions and relocations, and inadequate record-keeping practices by the BIA.

8. Congress should mandate that all federal agencies develop protocols regarding consultation with federally recognized, unacknowledged and terminated California tribes on all federal actions that may adversely affect Native American cultural resources within the tribes' aboriginal territories.

9. California tribes should receive adequate federal financial support to establish justice systems, either individually or as part of a consortium of tribes, so that they can effectively implement the Indian Child Welfare Act.

TO THE CONGRESS OF THE UNITED STATES

## Recommendations for Federal Agencies

10. **The National Park Service (NPS) should implement a comprehensive gathering policy for American Indians which recognizes the benefits of Native gathering to NPS goals and which does not make "direct ancestral association" a prerequisite for gathering in a park unit.**

**Discussion:** This recommendation is supported by current land management policies and federal law: (1) land management philosophies at the federal level are shifting towards "ecosystem management," which considers traditional Native cultural uses of natural resources to be beneficial in the reproductive potential of plant species[77]; (2) the President of the United States has ordered all federal land management agencies to work with tribes and tribal groups in a government-to-government relationship, and to consider the impact of current policies on Native religions and cultural practices; and (3) the American Indian Religious Freedom Act, 42 U.S.C. § 1996, mandates a review of agency policies and guidelines in an effort to identify procedures which may pose obstacles in meeting the intent of the Act.

11. **The U.S. Forest Service (USFS) should develop a final, comprehensive policy covering the complete range of Native American issues that arise in the management of national forests, and which clearly reinforces the tribal-federal trust relationship. This policy should apply to all California Indians, as defined in Section I(D), *supra*, at page 14, and should clearly articulate a no permit/no limit policy for non-commercial collecting for personal or Native community cultural use.**

12. **The USFS should also establish and fully fund tribal relations programs in each region and include permanent staff in each national forest, who are accessible to tribes with whom they must consult under the government-to-government relationship. The tribal relations programs should be funded to carry out education and training of agency line officers and staff in all divisions and programs whose policies and programs impact tribal resources. Training should emphasize the beneficial effects on plant and animal populations from local and regional traditional Native use and management.**

13. **The Environmental Protection Agency (EPA) and USFS should develop a partnership with impacted federally recognized and unacknowledged California tribes to implement a comprehensive pesticide and herbicide use consultation policy which recognizes aboriginal gathering practices and tribal interests in maintaining aboriginal rights and culturally relevant practices. Such a partnership should include tribal-federal agreements or mitigation plans with tribes impacted by proposed chemical sprays.**

14. **The EPA should formally respond to the California Indian Basketweavers Association petition to bring federal protection to California Indian gatherers, and should continue to investigate ways to protect Native people from harm caused by pesticide application on or near traditional food and plant gathering areas.**

15. **The current Bureau of Land Management (BLM) Native American Policy should be amended, after consultation with California Indians, to provide adequate guidelines for access and use of culturally significant areas. The California Indian Policy should provide a mechanism for awarding cultural resource use permits, which takes into account California Indian knowledge of, and respect for, their ancestral areas, and which eliminates unnecessary interference from BLM officials with California Indian religious practices as they take place. The terms for awarding the permits should be agreed upon prior to actual use, with a mechanism for immediate dispute resolution.**

Case 1:07-cv-01080   Document 1-6   Filed 05/21/2007   Page 16 of 27

16.  The Department of Defense should adopt regulations for appropriate tribal-federal consultation to ensure the protection of historically significant sites, and develop mitigation measures when a culturally sensitive area on or near lands held by the Department is to be developed. Funding should be made available through the Department of Defense to hire consultants chosen by the impacted tribes to conduct studies on whether a proposed action may have an adverse effect on religious or culturally significant properties administered by the Department.

17.  The criteria used by the Administration for Native Americans with regard to funding provided under the Native American Languages Act should be modified to: (1) extend program funding cycles to five to 10 years; (2) eliminate burdensome or unnecessary accounting requirements; and (3) adopt a separate funding equation for California, which takes into account the large number of small tribes and the huge language diversity and dialect differences.

## H.   The Report on Indian Health

**Summary:** This report is an assessment of the status of Indian health care programs in California. Principal issues identified by tribes, tribal health programs, urban health programs, non-federally recognized tribes, and persons of Indian descent eligible for services from the IHS, are analyzed and presented in significant detail in support of the recommendations included in Section II of the report.

In light of the identified funding deficiencies for California Indian health programs, testimony was provided wherein the issue of "Agency level assessments" on the IHS budget was raised and identified as an area to be studied as a source of funding that should be utilized to meet the unmet need in California. Sections III through VI provide historical background and a chronology of events in the history of health services in California and document the tribes' efforts to bring about equity in funding for health care services for the Indian people of California. A summary of testimony presented to the Health Task Force is included in Section V of the report.

### Recommendations:

1.   **Additional funding required for comprehensive health care services:** There are several different standards against which the level of funding necessary to operate a comprehensive health program for California Indians can be measured, including comparisons with other IHS areas, existing IHS Resource Allocation Methodology, local market comparisons, and national expenditure comparisons. Only the local market comparison methodology adjusts adequately for regional differences in the cost of providing health services and is free of political considerations. After surveying the California indemnity insurance market and the more directly analogous Health Maintenance Organization market, it was decided that the most appropriate comparative cost would be $2,400 per person per year. This figure represents the 1996 cost of providing comprehensive health care services in California.

To calculate the level of additional funding from the IHS, two additional planning assumptions would have to be made. The first is that the maximum penetration of the census population by the IHS funded health care system is approximately 66%. This percentage is higher than the current penetration rate of 52% which is somewhat depressed compared to historic rates and reflects the impact of consistent and significant underfunding. The second planning assumption is that 33% of the individual Indians who seek care at IHS funded Tribal Health Programs will be covered by alternative insurance, primarily Medi-Cal, the California Medicaid program. This rate of coverage is higher than the rate on the IHS maintained RPMS database but compares with rates found by Dr. Trudy Bennett in her 1994 study of Indian Health Care in California and information from a cross section of Tribal Health Programs. Given these planning assumptions, the calculation for additional funding from the IHS would be as follows:

$$122,004 \times .66 \times .66 \times \$2,400 - \$72,425,848 = \$55,122,152$$

*(Service population times the penetration rate times the rate of uninsured users times the market cost of comprehensive care, minus the available IHS funding level, equals the level of under-funding for tribal health programs in California.)*

THE ACCIP FINAL REPORTS AND RECOMMENDATIONS

TO THE CONGRESS OF THE UNITED STATES PURSUANT TO PUBLIC LAW 102-416
Case 5:07-cv-02681-JF    Document 1-6    Filed 05/21/2007    Page 18 of 27

2. **The California Contract Health Service Delivery Area (CHSDA):** The CHSDA currently consists of 37 rural counties. These counties were first identified administratively by the IHS as its official service areas and were later codified in statute as part of the Amendments to the Indian Health Care Improvement Act of 1988 (Pub. L. No. 100-713). Currently only two of the 37 CHSDA counties are without federally recognized tribes—Mariposa and Trinity. There are seven additional counties not included in the CHSDA, but could join it as a result of the granting of federal recognition to tribes located in the counties. The counties have large Indian populations, significant portions of which are California Indians.

It is therefore recommended that these counties be brought into the CHSDA as soon as possible and that funding for each of them be added to the IHS program within the area.

Using the same funding formula identified above, the new funding necessary to fully establish a comprehensive health program for the identified Indian population is as follows:

| County | Population | Additional Cost |
|--------|-----------|-----------------|
| Marin | 963 | $ 978,531 |
| Napa | 781 | 816,488 |
| Kern | 7,329 | 7,662,029 |
| Merced | 1,680 | 1,756,339 |
| Stanislaus | 4,363 | 4,561,254 |
| Monterey | 3,136 | 3,278,488 |
| San Luis Obispo | 2,364 | 2,471,420 |
| TOTAL ADDITIONAL COST | | $21,524,549 |

3. **Contract Health Services:** The Contract Health Service funding shortfall for California is $8 million dollars and is included in the global request for comprehensive health services.

4. **Small Tribes Facilities Program:** It is recommended that Congress fund the Small Tribes Facilities Program in order to correct the major deficiencies that exist for tribally operated health programs in California. Approximately $10 million dollars is required to correct identified deficiencies in tribal health and alcohol programs resulting from Deep Look Surveys conducted by the IHS California Area Office. IHS must be directed to survey all tribal, urban and alcohol programs. Information included in this report shows that only 24 health programs and three alcohol programs are included in the most recent Deep Look Survey, which indicates that approximately $5,385,061 is required to correct all existing deficiencies. This figure is calculated without the inclusion of information from and deficiencies of four residential alcohol programs, nine tribal health programs and seven urban health programs.

5. **Construction of Youth Regional Treatment Centers:** It is recommended that $10,000,000 be provided by Congress for construction of two Youth Regional Treatment Centers in California as authorized in Pub. L. No. 94-437 as amended.

6. **Environmental Health:** It is recommended that the IHS work with the BIA, the EPA and tribes to address the environmental health issues directly related to the dumping of toxic waste on California Indian reservations. There have been no definitive studies completed to identify the cost of clean up of the most dangerous sites—at Laytonville and Torres Martinez—however, the cost could be in the hundreds of millions of dollars. This is an urgent situation and must be acted upon without delay.

7. **Sanitation facilities funding requirements:** It is recommended that $18,761,000—the underfunded amount in sanitation facilities—be made available. These facilities are significantly underfunded for FY 96. The total project cost was estimated at $34,926,100 but the actual funding plan was $16,165,100.

8. **Urban Indian Health Program** recommendations are as follows:

    a. Health care reform legislation must include provisions for Essential Community Provider status, 100 percent cost-based reimbursements, grant subsidies, residency programs, and allocations of capital funds. This status, available to tribally operated programs, should be granted to all current and future Urban Indian Health Programs.

    b. Immediate transitional funding is vitally needed by Urban Indian Health Programs to build the infrastructure necessary to compete in a reformed health care delivery system. Any health care reform legislation must include the infusion of these capital dollars. Immediate technical assistance must be provided in the areas of managed care systems, capitated health care systems, computerization, quality assurance, cost accounting, management information systems, networking and other related systems needed to move successfully into health care reform.

    c. The present funding level of Urban Indian Health Programs must be increased to be commensurate with the average level of need funded for other IHS programs. Current level of need funded for tribal and IHS-operated programs is approximately 67%, whereas the level of need funded for Urban Indian Health Programs is approximately 22%.

9. **Traditional Indian Medicine:** In the area of Traditional Indian Medicine, it is recommended that the IHS, at the Headquarters level, collaborate with the Health Care Finance Administration to reform reimbursement regulations to include payment for traditional practitioners.

10. Recommendations regarding the IHS Scholarship Program are as follows:

    Amend 25 U.S.C. § 1603 to read:

    "Indians" or "Indian," unless otherwise designated, means any person who is a member of an Indian tribe . . . except that, for the purpose of sections 1612, 1613 and 1613a of this title, such terms shall mean any individual who (1) irrespective of whether he or she lives on or near a reservation, is a member of a tribe, band or other organized group of Indians, including those tribes, bands or groups terminated since 1940 and those recognized now or in the future by the State in which they reside, or who is a descendant, in the first or second degree, of any such member, or (2) is an Eskimo or Aleut or other Alaska Native, or (3) is considered by the Secretary of the Interior to be an Indian for any purpose, or (4) is determined to be an Indian under regulations promulgated by the Secretary.

OR

Amend § 1613a to incorporate the broad definition of "Indian" applicable to §§ 1612 and 1613.

In either case, the amendment should be written to apply retroactively and mandate that those who were denied scholarships based on the IHS interpretation of the 1992 amendments should have their alternative loans repaid.

11. Data collection and reporting recommendations are as follows:

a. It is recommended that IHS work with tribes and tribal contractors to evaluate IHS data reporting needs. Are items required in the past necessary in the current healthcare system (e.g. blood quantum)?

b. It is recommended that IHS work with tribes and tribal contractors to identify an electronic solution to meet the data reporting needs of IHS at headquarters and Area Office levels, as well as the needs of state governments, tribal governments, healthcare providers, insurers (including HMOs, PPOs), accrediting and licensing agencies, local program administrative and financial management, and local programs for other system needs.

c. It is recommended that IHS work with tribes and tribal contractors in evaluating an electronic medical record as replacement for the Resource and Patient Management System (RPMS). The system should be commercially available, interface with other computer systems (e.g. financial and billing), be modifiable by users to meet their specific needs (e.g. tribe of enrollment), be user-friendly, contain rigid security systems for protection of the data, and support creation of user-defined reports. In the interim, the RPMS should be revised to provide some of the features mentioned above.

d. It is recommended that, in the interim, IHS revise the RPMS to define/redefine data dictionary; capture required data to support patient and insurance billing; allow easy modification of data fields to capture data required by states; contain user-friendly report generation capabilities across all modules; accept/import data from other software programs (e.g. reference laboratory results, coding system upgrades); interface with other commercially available software programs; and capture and report quality indicator data.

e. It is recommended that Congress allocate funds for ongoing staff training in the RPMS. Congress should also allocate funds for video conferencing through partnerships with local community colleges, libraries or health programs and IHS trainers.

12. Creation of Statewide Indian Health Advisory Board: Congress should create and fund a state-wide advisory board made up of California Indians, including representatives designated by federally recognized and unacknowledged California tribes and other eligible Indian population groups, to consult with and advise the IHS in an oversight capacity regarding health care delivery issues and in updating tribal service contracts.

# ENDNOTES

1   Pub. L. No. 102-416 (October 14, 1992), as amended by Pub. L. No. 104-109 (February 12, 1996).

2   See Carey McWilliams, *California: The Great Exception*, (Peregrine Smith, Inc., 1976), at 50-51.

3   The refusal to ratify the treaties resulted in the displacement and impoverishment of Native peoples on a scale unparalleled in United States history in terms of acreage of aboriginal lands taken and the number of tribes affected. Not only were the California tribes deprived of their aboriginal lands, encompassing more than 70,000,000 acres, but they were denied the benefit of treaties negotiated in good faith that would have set aside approximately 8.5 million acres of land for 139 tribes.

4   See Bruce S. Flushman and Joe Barbieri, "Aboriginal Title: The Special Case Of California," 17 Pacific Law Journal 391, 403 (1986) and authorities cited therein.

5   See Act of September 30, 1850, 9 Stat. 519; 9 Stat. 558; and the California Indian Act of 1850, 9 Stat. 572. Representatives from 139 different Indian groups agreed to sign the 18 proposed treaties, thereby acknowledging the jurisdiction of the United States, agreeing to refrain from hostilities, and relinquishing all claims to their aboriginal territory. In return, the U.S. promised to establish reservations for the Indian groups, provide them protection from non-Indians, as well as clothing, food and education on the "art of civilization." See R.F. Heizer, *The Eighteen Unratified Treaties of 1851-1852 Between the California Indians and the United States Government*, (University of California Press, 1972), 33.

6   Act of March 3, 1851, 9 Stat. 631, entitled "An Act to Ascertain and Settle the Land Claims in the State of California."

7   These events had great significance in later efforts by the California Indians to obtain redress for the taking of their aboriginal lands. Those efforts culminated in the controversial settlement of the California Indian land claims in 1964 and the eventual per capita distribution of an amount representing compensation to the Indians of 47 cents per acre for their aboriginal lands. The history of the California Indian land claims is comprehensively set forth in Flushman and Barbieri, *supra* note 4.

8   H.R. Rep. No. 801, 103d Cong., 2nd Sess. 2 (1994). Estimates of the California Indian population in the 1850s are based on the estimated Indian population prior to arrival of the first Spanish expeditions in 1766. See Claims of California Indians: Hearing on H.R. 491 Before the Committee on Indian Affairs, 70th Cong., 1st Sess. 23 (1928) (Statement of Congressman Lea); Edward D. Castillo, *The Impact of Euro-American Exploration and Settlement*, in 8 *Handbook of North American Indians* 99 (R. Heizer, ed., Smithsonian, 1978) (nearly 300,000 unconquered natives); Cook, *Historical Demography* in *id.* at 91 (310,000, although estimates range from 133,000 to 260,000).

9   In 1860, the United States Senate considered a bill (H.R. 215) that proposed the transfer of federal responsibility for the California Indians to the State of California. The sometimes acrimonious debate over the bill focused on the widely reported accounts of the slaughter of California Indians by militia raised in the name of the State of California and supported in part by state funds. *Congressional Globe*, 36th Cong., 1st Sess., pp. 2365-2369 (Senate Debate, May 26, 1860), reprinted in Robert F. Heizer (ed.), *Federal Concern about Conditions of California Indians 1853 to 1913: Eight Documents* (Ballena Press, 1979), at 29-50 [hereinafter "Heizer"].

10   See Act of April 13, 1864, 13 Stat. 39 ["Four Reservations Act"].

11   25 U.S.C. §§ 461 *et seq.*

[12]   Robert N. Clinton et al., *American Indian Law* (3rd ed. 1991), 359.

[13]   The disastrous effects of the allotment period were detailed in a memorandum presented by John Collier, Commissioner of Indian Affairs, to the House Committee on Indian Affairs in 1934: See Hearings on H.R. 7902 before the House Comm. on Indian Affairs, 73rd Cong., 2d Sess. 16-18 (1934). Collier pointed out that, during the period from 1887 to 1934, Indian land holdings were reduced from 138,000,000 acres to 48,000,000, a loss of 65 per cent of the Indian land base.

[14]   See 25 U.S.C. § 464.

[15]   The Interior Board of Indian Appeals has held that the federal government's action in holding an IRA election within a rancheria community is determinative of the issue of whether the rancheria was recognized as a tribe prior to enactment of the Rancheria Act. See *United Auburn Indian Community v. Sacramento Area Director*, IBIA No. 92-186-A, 24 IBIA 33 (decided May 28, 1993).

[16]   See § V of the ACCIP Community Services Report.

[17]   See, *e.g.*, "The Status of the Indian in California Today, a Report by John G. Rockwell, Superintendent of the Sacramento Agency to the Commissioner of Indian Affairs," Sacramento Indian Agency, 1944.

[18]   Act of August 18, 1958, Pub. L. No. 85-671, 72 Stat. 619, as amended by the Act of August 11, 1964, Pub. L. No. 88-419, 78 Stat. 390.

[19]   See Appendix B to the ACCIP Termination Report.

[20]   See Auburn Indian Restoration Act, Act of October 31, 1994, 108 Stat. 4533, 25 U.S.C. §§ 1300l *et seq.*; and Paskenta Band Restoration Act, Act of November 2, 1994, 108 Stat. 4793, 25 U.S.C. §§ 1300m *et seq.*

[21]   E.F. Beale, "Recommendations on Federal Assistance for California Indians, 1852," contained in Documents of the Senate of the United States During the Special Session Called March 4, 1853, Executive Document No. 4, (Gov't Printing Office, Washington, D.C., 1853), pp. 377-80 . Reprinted in Heizer, *supra* note 9, at 5.

[22]   Id. at 2-3.

[23]   Helen Jackson and Abbot Kinney, "Report on the Condition and Needs of the Mission Indians of California," contained in Reports of Committees of the Senate of the United States, 48th Congress, 2nd Sess, and Special Sess., March, 1885, at pp. 120-196. Reprinted as Appendix XV in Helen Hunt Jackson, *A Century of Dishonor* (1885), and in Heizer, *supra* note 9, at 75-93.

[24]   Heizer, *supra* note 9, at 76.

[25]   Id. at 83.

[26]   C.E. Kelsey, "Report of Special Agent for California Indians" (1906), reprinted in Heizer, *supra* note 9, at 123-150. Kelsey's report was commissioned by the United States Congress. 33 Stat. 1058 (1905).

[27]   See Heizer, *supra* note 9, at 139.

28   "Indians in California," in *Transactions of the Commonwealth Club of California*, Vol. XXI, No. 3, June 8, 1926.

29   Id. at 106.

30   Chauncey Goodrich, *The Legal Status of the California Indian*, 14 Cal. L. Rev. 83 (1926). Chauncey Goodrich was a member of the Indian Section of the Commonwealth Club of California and conducted his research under the auspices of the club.

31   Id. at 97. Goodrich relied on Indian BIA figures in official reports to calculate that annual expenditures for fiscal year 1923-24 were $29.00 per capita for California Indians and $40.00 per capita for all other Indians. If one excluded from the latter statistic the fee-simple allotted Indians who had been "so largely released from federal guardianship," the $40.00 figure increased to $66.00 per capita for Indians outside of California. *Id.*, at n.55.

32   Lipps's detailed statement appears in his letter of November 9, 1933, to Senator Burton K. Wheeler, co-author of the Wheeler-Howard Act, better known as the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.*

33   Id. at 1.

34   Id. at 7.

35   John G. Rockwell, *The Status of the Indian in California Today* (1944), pp. iii.

36   Id. at 126.

37   "Final Report to the Governor and the Legislature by the California State Advisory Commission on Indian Affairs" (1969), p. 12.

38   See Id., Appendix E, p. 33.

39   *Congressional Record*, July 16, 1971, S11323-11324. Included as part of the statement by Senator John Tunney.

40   Id. at S11323.

41   *Congressional Record*, May 31, 1972, S8591.

42   Report to the BIA, Ernest Stevens and John Jollie, Co-Chairs.

43   Id. at 27.

44   Id. at 31.

45   Id. at 34.

46   Prepared by William D. Oliver, former Administrative Officer to the Sacramento Area, at the request of the Sacramento Area Indian Advisory Board.

[47]  Id. at 4. In making these calculations, the author compared only expenditures for programs that existed at both Sacramento and the other BIA area offices.

[48]  This task force was appointed by Secretary of Interior William Clark during the Ronald Reagan administration.

[49]  "Report of the California Indian Task Force" (October, 1984), p. 2.

[50]  Id. at 12.

[51]  Id. at 34-35. See also id. at 12: "These [population] numbers . . . have not been utilized in the past to determine or establish funding or program levels. . . ."

[52]  Id. at 13.

[53]  Prepared by California Indian Legal Services for the George Washington National Indian Policy Center.

[54]  Summary Report on the California Consultation Meeting, Stanford University, May 5, 1991, at 7-8.

[55]  In Rincon Band of Mission Indians v. Harris, 618 F.2d 569 (9th Cir. 1980), the Ninth Circuit Court of Appeals held that the IHS had breached its statutory responsibilities to the California Indians under the Snyder Act, 25 U.S.C. § 13, by failing to develop distribution criteria rationally aimed at an equitable division of its funds. Id. at 575. It was not until the Rincon case was won and Congress established the "Equity Fund" in FY 1981 that California Indians began to receive an increased, though still inequitable, share of the Indian health care funding appropriated by Congress.

[56]  See Malone v. Bureau of Indian Affairs, 38 F.3d 433, 438 (9th Cir. 1994).

[57]  See Pub. L. No. 102-416, § 5(5).

[58]  Congressional Record, H7975 (August 11, 1992).

[59]  See 25 U.S.C. § 1679.

[60]  25 U.S.C. § 13.

[61]  Malone, supra, 38 F.3d at 438.

[62]  See Message from the President of the United States Transmitting Recommendations for Indian Policy, H.R. Doc. No. 363, 91st Cong., 2nd Sess. (1970).

[63]  See S. Rep. No. 330 to accompany S. 1747, A Bill Providing for the Restoration of Federal Recognition to the Ponca Tribe of Nebraska, and for Other Purposes, 101st Cong., 2nd Sess. 1990 (Testimony of Eddie F. Brown, Assistant Secretary - Indian Affairs).

[64]  See, e.g., the Report of L.A. Dorrington to the Commissioner of Indian Affairs, dated June 3, 1927, at pp. 2, 5, 8, 11, 16, 22 (wherein Mr. Dorrington recommends against acquiring land for various bands of California Indians because their members held public domain and Indian allotments).

65   See 25 U.S.C. § 1679.

66   For a thoughtful discussion of some recent precedents for transferring public lands to Indian tribes as a means of "doing justice," even though existing law may not compel such action, *see* Imre Sutton, *Indian Land, White Man's Law: Southern California Revisited*, Amer. Indian Culture and Research Journal 18:3 (1994) 265-270. Professor Sutton suggests that "[p]erhaps we need to negotiate not just in terms of law, but in terms of ethics and ecology. . . ." (*id.* at 268) and recommends that Indian reserves could be created out of some of the national forests and the holdings of the Bureau of Land Management (*id.* at 269).

67   *Seminole Tribe of Florida v. Florida*, 116 S. Ct. 1114, 134 L. Ed.2d 252 (1996).

68   9 Stat. 631.

69   Whether a tribe, in the absence of state consent to suit, can request that the Secretary prescribe procedures [See 25 U.S.C. §§ 2701(d)(7)(B)(vii)] under which the tribe may engage in Class III gaming activities, is still an unsettled issue.  See, *e.g.*, *Seminole Tribe of Florida v. State of Florida*, 11 F.3d 1016, 1029 (11th Cir. 1994).

70   *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987).

71   The Spokane Tribe in Washington State has made the argument that, even in the absence of congressional action, either a tribal remedy must be read into the IGRA or it must be declared unconstitutional.  See *United States of America v. Spokane Tribe of Indians*, CS-94-0104-FVS (E.D. WA), Answer, Counterclaims and Third-Party Complaint for Declaratory Judgment, Injunctive and Declaratory Relief, at p. 7 (filed April 5, 1994), currently on appeal to the Ninth Circuit Court of Appeals. Specifically, the Spokane Tribe argued that: (1) if there is no remedy, IGRA is unconstitutional in its entirety; and (2), in the alternative, the Secretary of the Interior has a trust obligation to provide a remedy by promulgating regulations allowing Class III gaming when a state refuses to negotiate in good faith.  *Id.*

72   *Brendale v. Confederated Tribes and Bands of the Yakima Reservation*, 492 U.S. 708 (1989).

73   *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251 (1992).

74   See § II of the ACCIP Report on California Indian Cultural Preservation.

75   See, *e.g.*, *Malone v. Bureau of Indian Affairs*, 38 F.3d at 439-440.

76   25 U.S.C. § 13.

77   See, Richard Haeuber, "Setting the Environmental Policy Agenda: The Case of Ecosystem Management," 36 Nat. Res. L. Jour. 1 (Winter 1996).  Ecosystem management is an ecological and systematic approach to managing natural resources at a landscape scale. Such a system considers the importance of protecting ecosystems as well as individual species; factoring natural disturbance regimes into management schemes; and the utility of a core reserve/buffer zone design approach for natural resource protection.  In the 1970s the concept was recast in the form of *biosphere reserves* that included *transition zones* of human activity compatible with the natural ecosystem.

Ecosystem Management is being fully explored by 18 federal agencies, and the major land management agencies already have drafted guidance regarding its adoption. Moreover, the former White House Office on Environmental Policy has undertaken a major ecosystem management initiative, including demonstration projects, and both the 103rd and 104th Congress held numerous hearings and briefings in both the House and Senate regarding legislation to amend the Federal Land Policy and Management Act. 26 U.S.C. §§ 1701-1704 (1988). See Haeuber at 9-10.

**EXHIBIT L**

# ...atus of California Rancherias
## Terminated Pursuant to the Rancheria Act

| | Restored Through *Tillie Hardwick* Litigation (17 Tribes) | Restored Through *Scotts Valley* Litigation (4 Tribes) | Restored Through Separate Litigation (6 Tribes) | Restored Legislatively (3 Tribes) | Remains Terminated (10 Tribes) |
|---|---|---|---|---|---|
| **40 Terminated CA Tribes** | | | | | |
| **Alexander Valley** | | | | | X |
| **Auburn** | | | | X | |
| **Big Sandy** | | | X | | |
| **Big Valley** | X | | | | |
| **Blue Lake** | X | | | | |
| **Buena Vista** | X | | | | |
| **Cache Creek** | | | | | X |
| **Chicken Ranch** | X | | | | |
| **Chico** | | X | | | |
| **Cloverdale** | X | | | | |
| **El Dorado** | | | | | X |
| **Elk Valley** | X | | | | |
| **Guidiville** | | X | | | |
| **Graton** | | | | X | |
| **Greenville** | X | | | | |
| **Hopland** | | | X | | |
| **Indian Ranch** | | | | | X |
| **Lytton** | | X | | | |
| **Mark West** | | | | | X |
| **Mission Creek** | | | | | X |
| **Mooretown** | X | | | | |
| **Nevada City** | | | | | X |
| **North Fork** | X | | | | |
| **Paskenta** | | | | X | |
| **Picayune** | X | | | | |
| **Pinoleville** | X | | | | |
| **Potter Valley** | X | | | | |
| **Quartz Valley** | X | | | | |
| **Redding** | X | | | | |
| **Redwood Valley** | X | | | | |
| **Robinson** | | | X | | |
| **Rohnerville** | X | | | | |
| **Ruffeys** | | | | | X |
| **Scotts Valley** | | X | | | |
| **Smith River** | X | | | | |
| **Strawberry Valley** | | | | | X |
| **Table Bluff** | | | X | | |
| **Table Mountain** | | | X | | |
| **Upper Lake** | | | X | | |
| **Wilton** | | | | | X |