CHRISTINA V. KAZHE (BAR NO. 192158)
JOHN NYHAN (BAR NO. 51257)
ROSE WECKENMANN (BAR NO. 248207)
**FREDERICKS & PEEBLES LLP**
1001 Second Street
Sacramento, California 95814
Telephone:    (916) 441-2700
Facsimile:    (916) 441-2067
Email:        jnyhan@ndnlaw.com





MAY 2 1 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

Attorneys for Plaintiffs,
WILTON MIWOK RANCHERIA, a formerly
Federally-recognized Indian tribe and
ITS MEMBERS; and DOROTHY ANDREWS

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

WILTON MIWOK RANCHERIA, a formerly
federally recognized Indian Tribe, ITS
MEMBERS and DOROTHY ANDREWS,

          Plaintiffs,

     v.

DIRK KEMPTHORNE, Secretary of the
Department of the Interior; CARL J. ARTMAN,
Assistant Secretary for Indian Affairs of the
United States Department of Interior; the
UNITED STATES DEPARTMENT OF THE
INTERIOR; MICHAEL O. LEAVITT, Secretary
of the United States Department of Health and
Human Services; the UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

          Defendants.

Case No. C 07 02681 PVT

DECLARATION OF DOROTHY
ANDREWS IN SUPPORT OF
PLAINTIFFS' ADMINISTRATIVE
MOTION TO CONSIDER WHETHER
CASES SHOULD BE RELATED

I, DOROTHY ANDREWS, declare:

1.    I am personally familiar with the facts set forth in this Declaration and if sworn as a witness, I could competently testify to the following from my personal knowledge except as to those matters set forth upon information and belief, and as to such matters, I believe them to be true.

2.    I am a member of the Wilton Miwok Rancheria, a formally federally recognized Tribe, and reside at 9418 Rancheria Drive, Wilton, CA 95693.

3.      In 1959, the United States Department of the Interior distributed deeds to the land which then comprised the Wilton Rancheria to the members of the Tribe who owned the property at that time in accordance with a Distribution Plan which is attached to this Declaration as Exhibit A. The individuals who received this land were the original distributees of the Wilton Rancheria land. I am the sole surviving original distributee. I shall refer to this distribution of land as "the Termination".

4.      In 1951, my husband and I purchased a house on what was identified in the deed distributed to me in 1959 as Lot 4 of the Wilton Rancheria. Our house on Lot 4 burned down in 1953. At the time the land was distributed to us by the Bureau of Indian Affairs ("BIA"), I was married, and had four children, Jackie, Lawrence, Anita, and Beverly.

5.      At the time of the Distribution in 1959, there was no structure existing on my property, Lot 4, or on the property owned by John McKean, identified in the Distribution Plan as Lot 7. There were approximately eleven houses on other lots on the Rancheria and one road running through the Rancheria.

6.      Prior to Termination, there was no running water in any of the houses on the Rancheria and we all used outhouses. As part of the termination process, the BIA was to install a septic system on each parcel of property listed in the Distribution Plan. However the BIA did not install a septic system on the two properties in the Rancheria which did not have houses on them at the time the work was done, my Lot 4, and John McKean's Lot 7. In addition, the BIA did not install a septic system on the property my mother, Virginia Hatch, owned and lived in, identified as Lot 12 in the 1959 Distribution. I am informed and believe that when my mother inquired as to why she did not receive a septic system, she was advised by employees of the BIA that the Bureau ran out of materials and supplies to install the septic system for her home.

7.      As part of the termination process, the BIA installed toilets and kitchen sinks in nine of the houses on the Rancheria. In order to have a toilet installed in his or her house, distributees had to either construct a bathroom by adding an additional room onto their house or convert an existing room into a bathroom. The vast majority of distributees did not have sufficient funds to build an additional room onto their house and they were forced to convert a bedroom into a bathroom in order to have a

1 toilet installed. However, my mother Virginia Hatch, lived in a two room house on Lot 12 and she

2 could not afford to add on a new room to her house to accommodate a toilet and could not give up one

3 of the two rooms in her house to convert it into a bathroom. The BIA did not provide any resources to

4 my mother to allow her to add a room for a toilet and she did not receive one.

5      8.    Soon after the septic systems were installed on the Rancheria lots, the systems began to

6 fail. I am informed and believe that Tribal members Charles McKean, who lived in a house on Lot 11,

7 and Ella Taylor, who lived in a house on Lot 5, had problems with their toilets and septic systems

8 immediately after they were installed and they did not work.

9      9.    Prior to termination, the residents of the Rancheria got our water from a holding tank

10 supplied by a well. The water smelled and tasted bad and ran dry during certain times of the year.

11 There was no indoor plumbing in any of the houses. Residents of the Rancheria had to haul water to

12 our houses from the holding tank. As part of the Termination process, the BIA set aside Lot 9 as a

13 parcel to be held in common by the community on which they were to construct a new well, but the

14 well installed by the BIA never worked adequately.

15      10.    Neither the BIA nor the Indian Health Services ("IHS") did anything to improve the

16 quality or quantity of water available on the Rancheria. After Termination, in order to correct the

17 water problems, each distributee paid $400.00 to install a new well on the Rancheria and $1,000.00 to

18 install a new water tank. Despite digging the well deeper and installing the new tank, water on the

19 Rancheria was still cloudy and pressure in the system was still inadequate, and remains so to this day.

20      11.    Neither the BIA nor the IHS provided or installed any bathtubs, showers, or sinks, other

21 than a kitchen sink, for the distributees. No sinks were installed in the bathrooms and the toilets that

22 were installed never worked properly.

23      12.    We never received an adequate water or sewer system from the BIA or the IHS.

24      13.    Prior to Termination, the Tribe was organized under a constitution with a Tribal

25 Council. My uncle, Charles McKean was a Tribal Chairman. No representative of the BIA or the IHS

26 ever met with me or, to my knowledge, with other distributees or members of the Tribe or with the

27

28

DECLARATION OF DOROTHY ANDREWS IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE MOTION

Tribal Council to review with us our legal rights under the California Rancheria Act or to advise us of what services we were entitled to receive under the Act.

14.    I have read the Certificate of Counsel re hearing on Approval of Settlement of Class Actions dated November 16, 1983, (attached as Exhibit B) and signed by David J. Rapport, one of the lawyers from the California Indian Legal Services office who was representing plaintiffs, including me and other members of the Wilton Rancheria who had been certified as members of the class in *Tillie Hardwick et al. v. United States of America, et al.* Mr. Rapport states in his Certification at page 9, lines 1-10:

> Class members from twelve (12) of the remaining seventeen rancherias represented in this action would be dismissed from this action without prejudice to their right to refile another action or other actions on their behalf. No class member from these rancherias currently owns real property within the original rancheria boundaries. The property was either sold to non-Indians when the rancheria was terminated and the proceeds of these sales distributed to rancheria members in lieu of deeds to individual parcels of property or all of the property originally distributed was subsequently sold to non-Indians.

[footnote omitted]

15.    Mr. Rapport's statement that "No class member from these rancherias currently owns property within the original rancheria boundaries" is not correct. His next statement, that "The property was either sold to non-Indians when the rancheria was terminated and the proceeds of these sales distributed to rancheria members in lieu of deeds to individual parcels of property or all of the property originally distributed was subsequently sold to non-Indians" is also not correct. As noted above, I lived on the Wilton Rancheria property identified as Lot 4 in 1951 and owned it until 1962 when I sold it because I could not afford to maintain it. In 1969, my aunt Ada Madrigal gave me her land on the Rancheria which was Lot 8 in the Distribution Plan. I have owned and resided on this land since that time. At no point did I ever sell this property to non-Indians or anyone else. The following other owners of lots in the Wilton Rancheria owned Rancheria property and the individuals listed below were members of the Wilton Miwok Rancheria at the time that Mr. Rapport submitted his Certificate to the Court in 1983:

**Lot 1**  Jane D. Brown
**Lot 5**  Eddie Taylor and Ronda Benson Taylor
**Lot 6**  Charles J. McKean, Jr.

DECLARATION OF DOROTHY ANDREWS IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE MOTION

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

**Lot 7**  Bertha E. McKean
**Lot 8**  Dorothy Andrews
**Lot 9**  Cosumnes River Indian Association
**Lot 10** Gertrude Dupree
**Lot 11** Charles J. McKean, Jr.
**Lot 12** Herman and Constance Tripp
**Lot 13** Cosumnes River Indian Association
**Lot 14** Charles J. McKean, Jr.

16.    I can only speculate as to why Mr. Rapport did not have the correct information available to him. I am informed and believe that one of the other owners of property located in Wilton Rancheria at the time, Jane Martinez Brown, the original distributee of Lot 1, who then still owned and resided on Lot 1, attended the hearing held by the Court to consider whether to approve the class action settlement and attempted to present a statement to the court at that hearing. She terminated her statement when she was informed that Wilton Rancheria was not included in the proposed settlement.

17.    I have read the Findings and Recommendation of the United States Magistrate Joan S. Brennan dated December 15, 1983, submitted to the *Tillie Hardwick* Court (attached to this Declaration as Exhibit C) which notes that Magistrate Brennan conducted a hearing on December 14, 1983, on whether to recommend the District Court approve the terms of the Class Action Settlement Agreement and enter a stipulated judgment against the United States. Judge Brennan noted at page 3 of her report that approximately 40 Class members appeared at the December 14, 1983 hearing and the Court afforded each Class member the opportunity to speak in support of or opposition to the proposed settlement. The findings note that six Class members spoke, including Jane Brown and that "Ms. Brown of the Wilton Rancheria terminated her statement when she was informed that Wilton is not included in the proposed settlement."

18.    I also know that many other heirs and legatees of other distributees continue to own land and reside on Wilton Miwok Rancheria today and did so at the time the settlement was approved by the Court. Attached to this Declaration as Exhibit D is a list of those people, entitled "Lands Within the Original Boundaries of the Wilton Miwok Rancheria Personally Owned by the Distributees, Dependent Members, Their Heirs, or Legatees." Currently, fifty percent (50%) of the lots within the exterior boundaries of the Wilton Miwok Rancheria are Indian-owned.

DECLARATION OF DOROTHY ANDREWS IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE MOTION

19.    At the time the *Tillie Hardwick* settlement was approved by the Court, I did not understand or know the specifics of those proceedings.  As a result of the mistaken dismissal of me and other members of the Tribe from the Plaintiff Class in *Tillie Hardwick*, we have been unfairly denied the restoration of our status as an Indian tribe under the laws of the United States, a status stripped from us by the California Rancheria Act of 1958.  Instead, we have continued to suffer the social and economic consequences of termination which has made it difficult, if not impossible, for us to pursue our rights in the intervening years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___ day of May 2007, in Elk Grove, California.


Dorothy Andrews

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

DECLARATION OF DOROTHY ANDREWS IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE MOTION

1

## Exhibits to Declaration of Dorothy Andrews

2

A:    A Plan for Distribution of the Assets of the Wilton Rancheria, approved
3           August 18, 1958.

4

B:    Certificate of Counsel Re Hearing on Approval of Settlement of Class Actions,
5           filed Nov. 17, 1983 in *Tillie Hardwick v. United States of America* U.S.D.C.
            Northern District of California No. C-79-1710-SW.

6

C:    Findings and Recommendation of Magistrate Joan S. Brennan re Approval of
7           Class Action Settlement, filed December 15, 1983 in *Tillie Hardwick v. United*
8           *States of America* U.S.D.C. Northern District of California No. C-79-1710-SW.

9

D:    Chart, Lands Within the Original Boundaries of the Wilton Miwok Rancheria
10         Presently Owned by the Distributees, Dependent Members, Their Heirs, or
            Legatees.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DOROTHY ANDREWS IN SUPPORT OF PLAINTIFFS' ADMINISTRATIVE
MOTION

MONTEAU &
PEEBLES, LLP
1001 SECOND ST.
SACRAMENTO, CA

**EXHIBIT A**

A PLAN FOR THE DISTRIBUTION OF THE ASSETS OF THE
WILTON RANCHERIA, ACCORDING TO THE PROVISIONS OF
PUBLIC LAW 85-671, ENACTED BY THE 85th CONGRESS,
APPROVED AUGUST 18, 1958

The Wilton Rancheria, 38 and 81/100 acres, is located north of the Wilton Post Office and general store, about twenty-four miles southeast of Sacramento, California, in Sacramento County.

The homesite area of the rancheria is located on high ground which is also adaptable for home consumption gardens. The northerly portion of the rancheria is lower than the homesite area and is subject to flooding during years of abnormally high runoff. A drainage ditch divides the high ground from the low ground.

An improved county road runs along one side of the rancheria with access to the Wilton Road directly in front of the rancheria. The road which provides access to the residences does not meet minimum specifications for Sacramento County and should be rebuilt.

The domestic water system is old and should be rehabilitated. The cost of the development of the present water system has been placed as a lien against the rancheria.

The outer boundaries of the rancherias have been surveyed and iron pipes set at various reference points. Interior surveys will be required.

The rancheria is organized under Section 16 of the Indian Reorganization Act of June 18, 1934, as the Me-Wuk Indian Community of the Wilton Rancheria, California. The constitution and by-laws

were approved January 16, 1936, and were subseq___ly amended on two different occasions. A charter was never issued to the group.

There are no Government-owned buildings on the rancheria.

There are no funds on deposit to the credit of the rancheria, either in an Individual Indian Money Account in the Area Office or in the United States Treasury.

The distributees listed in this plan are recognized as the only people of the rancheria who hold informal assignments and are entitled to share in the distribution of the property.

No minors will receive deeds in the distribution of the real estate and all adults participating are capable of handling their own affairs.

All distributees are fully advised of the opportunity to participate in the vocational training program afforded by the Bureau of Indian Affairs and no one has indicated any interest.

The Indians of the Wilton Rancheria desire termination of Federal trusteeship under the provisions of Public Law 85-671 and request that the Bureau of Indian Affairs undertake the following actions.

1. Provide assistance for the establishment of such legal entity as might be necessary to accept the conveyance of properties that are to be retained in common by the group.

2. Convey ownership of Lot No. 9 (area surrounding the water tank), Lot No. 12 (area to be set aside as a playground), and the water system to the distributees as owners-in-common or to a legal entity organized to accept them.

3. Make such surveys as are necessary to convey a merchantable and recordable title to each lot.

2

4. Rehabilitate the present domestic water system by replacing all leaky, defective water pipes and providing water connections to all occupied residences or other residences constructed or in the course of construction and more than fifty percent completed within a ninety (90) day period after approval of this plan by the Indians of the Wilton Rancheria.

5. Construct a road at the location shown on the attached map that will meet the minimum specifications of the Sacramento County Road Department and turn this road over to the County for operation and maintenance.

6. Cancel all reimbursable indebtedness owing to the United States on account of unpaid construction and/or operation and maintenance charges for water facilities.

7. Furnish each distributee with the approximate value of his lot at the time of conveyance.

8. Revoke the constitution and by-laws of the Me-Wuk Indian Community of the Wilton Rancheria upon receipt of a financial statement from the group including a certificate that all the debts and obligations of the organization have been liquidated or adjusted and that all the assets of the organization have been or are simultaneously therewith conveyed to persons or corporations authorized to receive them.

9. Convey to individual Indians according to this plan, and the map attached hereto which is a part of this plan, unrestricted title to the following lands constituting the Wilton Rancheria,

3

subject to existing rights-of-way, easements or leases.

Lots 615, 616 and 617 of Central California Traction
Unit No. 7, according to the official plat thereof
filed in the Office of the Recorder of Sacramento
County, California, on May 11, 1912, in Book 13
of Maps, Map No. 20.

Title will also include such mineral and water rights as are
now vested in the United States.

The distributees who will receive title to particular lots and
the dependent members of their immediate families are:

| NAME | LOT NO. | RELATIONSHIP | BIRTHDATE | ADDRESS |
|---|---|---|---|---|
| Jane Brown | 1 | Distributee | 9-20-1922 | General Delivery Wilton, California |
| Donald L. Brown | | Son | 1-04-1949 | Same |
| Debra E. Brown | | Daughter | 2-17-1954 | Same |
| | | | | |
| Archie G. Williams | 2 | Distributee | 10-08-1907 | General Delivery Wilton, California |
| Edith G. Williams | | Wife | 1-18-1912 | Same |
| Mildred Williams | | Daughter | 3-23-1941 | Same |
| Jerome J. Williams | | Son | 5-20-1942 | Same |
| Alfred E. Williams | | Son | 6-15-1943 | Same |
| Wilson R. Williams | | Son | 3-12-1945 | Same |
| Carol Mae Williams | | Daughter | 5-07-1946 | Same |
| Silvia Williams | | Daughter | 5-30-1947 | Same |
| Joanna Francis Williams | | Daughter | 11-13-1950 | Same |
| | | | | |
| Eva Irish | 3 | Distributee | 1-28-1893 | General Delivery Wilton, California |
| | | | | |
| Dorothy Andrews | 4 | Distributee | 8-16-1930 | 5734 Mascot Avenue Sacramento, California |
| Jacqueline V. Andrews | | Daughter | 2-02-1950 | Same |
| Anita D. Andrews | | Daughter | 7-01-1953 | Same |
| Beverly G. Andrews | | Daughter | 4-19-1955 | Same |
| Lawrence C. Andrews | | Son | 1-24-1951 | Same |

4

| NAME | LOT NO. | RELATIONSHIP | BIRTHDATE | ADDRESS |
|------|---------|--------------|-----------|---------|
| Ella Taylor | 5 | Distributee | 4-15-1888 | General Delivery Wilton, California |
| Annie McKean | 6 | Distributee | 7-04-1882 | General Delivery Wilton, California |
| John McKean | 7 | Distributee | 6-21-1916 | General Delivery Wilton, California |
| Ada Madrigal | 8 | Distributee | 4-15-1888 | General Delivery Wilton, California |

Community Property 9

| NAME | LOT NO. | RELATIONSHIP | BIRTHDATE | ADDRESS |
|------|---------|--------------|-----------|---------|
| Gertrude Dupree | 10 | Distributee | 2-09-1892 | General Delivery Wilton, California |
| Charles McKean, Jr. | 11 | Distributee | 12-06-1904 | P. O. Box 167 Wilton, California |
| Bertha McKean | | Wife | 2-28-1914 | Same |
| Paul J. McKean | | Son | 7-24-1942 | Same |
| Lloyd J. McKean | | Son | 5-19-1944 | Same |
| Billie W. Daniels | | Stepson | 12-24-1942 | Same |
| Jimmie E. Daniels | | Stepson | 8-28-1944 | Same |
| Richard A. Daniels | | Stepson | 9-08-1945 | Same |

Community Property 12

| NAME | LOT NO. | RELATIONSHIP | BIRTHDATE | ADDRESS |
|------|---------|--------------|-----------|---------|
| Virgie Hatch | 13 | Distributee | 10-03-1901 | P. O. Box 84 Wilton, California |

Upon approval of this plan or a revision thereof by the Secretary of the Interior and acceptance thereof by a majority of the adult Indian distributees, as provided in Section 2(b) of Public Law 85-671, the distributees and the dependent members of their immediate families listed in this plan shall be the final list of Indians entitled to participate in the distribution of the assets of the Wilton Rancheria, and the rights or beneficial interests in the property of each person whose name appears in this list shall constitute vested property which

5

alienation or encumbrance before the transfer       itle to such property.

After the assets of the Wilton Rancheria have been distributed pursuant to this plan and Public Law 85-671, the Indians who receive any part of such assets and the dependent members of their immediate families shall thereafter not be entitled to any of the services performed by the United States for those persons because of their status as Indians. All statutes of the United States which affect Indians because of their status as Indians shall not apply to them and the laws of the several states shall apply to them in the same manner as they apply to other citizens or persons within their jurisdiction. Nothing in this plan, however, shall affect the status of such persons as citizens of the United States.

All provisions of Public Law 85-671 shall be applicable in the execution of this plan and general notice of the contents shall be given by posting a copy of this plan in the post office at Wilton, Sacramento County, California, by posting a copy in a prominent place on the Wilton Rancheria, by mailing a copy to the head of each individual family participating in this plan and by mailing a copy to any person who advises the Sacramento Area Office that he feels that he may have a material interest in the plan.

This plan was prepared by the Area Director, Bureau of Indian Affairs, Sacramento Area Office, pursuant to the authority delegated on February 26, 1959, and after consultation with the Indians of the Wilton Rancheria.

Approved, with authority retained
to revise or change if appeals are
received within 30 days after gen-
eral notice to this plan is given.

H. REX LEE
Acting Commissioner
Date _____ July 6, 1959 _____

GENERAL NOTICE

Date JUL 1 4 1959

Posted herewith is a Plan for the Distribution of the

Assets of the        WILTON RANCHERIA

according to the provisions of Public Law 85-671, approved August 18,

1958.

Public Law 85-671 provides that General Notice shall be

given of the contents of any plan prepared pursuant to the provisions

of this law.

Any Indian who feels that he is unfairly treated in the pro-

posed distribution of the property shall present his views and arguments

in writing to the Secretary of the Interior within thirty (30) days

after the date of the posting of this general notice. Such protest,

stating fully the reasons why he thinks he is being unfairly treated,

shall be mailed to the Area Director, Sacramento Area Office, Federal

Building, Post Office Box 749, Sacramento 4, California, who will

promptly forward it to the Secretary of the Interior. After the

protest has been considered by the Secretary, this plan, or a revision

thereof, shall be submitted for the approval of the adult Indians who

will participate in the distribution of the property, and if the plan

is approved by a majority of such Indians who vote in an election

called for that purpose by the Area Director of the Sacramento Area

Office, the plan will be carried out.

If the law is not fully understood by any participating mem-

bers, they should immediately contact the Sacramento Area Office,

Sacramento, California.

**EXHIBIT B**

1    DAVID J. RAPPORT
     LESTER J. MARSTON
2    CALIFORNIA INDIAN LEGAL SERVICES
     200 West Henry Street
3    Post Office Box 488
     Ukiah, California 95482
4    Telephone: (707) 462-3825

5    Attorneys for Plaintiffs

6

7

8

9

10

11

12                    IN THE UNITED STATES DISTRICT COURT

13                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16                                    )    No. C-79-1710-SW
                                      )
17   TILLIE HARDWICK, et al.,         )    CERTIFICATE OF COUNSEL
                                      )    RE: HEARING ON APPROVAL
18                    Plaintiffs,     )    OF SETTLEMENT OF CLASS
                                      )    ACTIONS
19   v.                               )
                                      )
20   UNITED STATES OF AMERICA, et al.,)
                                      )
21                    Defendants.     )

22

23        David Rapport, attorney of record for plaintiffs

24   herein, hereby certifies as follows:

25        I am an attorney in the employ of California Indian

26   Legal Services (C.I.L.S.), a California non-profit corporation

27   receiving a grant from the Legal Services Corporation for

28   provision of legal services to indigent California Indians.  One

                              -1-

of the principal activities of C.I.L.S., since its establishment in 1968 has been representing Indian victims of the disastrous federal policy of "termination" embodied in the California Rancheria Act of 1958, 72 Stat. 390, in vindicating their rights. When this action was filed in 1979, C.I.L.S. already was litigating or had litigated (in 15 different lawsuits) the validity of the implementation of the California Rancheria Act at nine specific Rancherias.  Among those cases have been <u>Kelly</u> v. <u>U.S. Dep't of the Interior</u>, 339 F. Supp. 1095 (E.D. Calif., 1976); <u>Duncan</u> v. <u>Andrus</u>, 517 F. Supp. 1 (N.D. Calif., 1977); <u>Duncan</u> v. <u>Smith</u> v. <u>U.S.A.</u>, 515 F. Supp. 56 (N.D. Calif., 1978); <u>Duncan</u> v. <u>U.S.A.</u> (Duncan I), 597 F.ed 1337 (Ct. Cl., 1979), vacated and remanded <u>sub nomine</u> <u>U.S.A.</u> v. <u>Duncan</u>, 446 U.S. 903 (1980); <u>Duncan</u> v. <u>U.S.A.</u> (Duncan II), 667 F.2d 36 (Ct. Cl., 1981), <u>cert.</u> pending; <u>Taylor</u> v. <u>Hearne</u>, 637 F.2d 689, (9th Cir., 1981), <u>cert.</u> den., 454 U.S. 851; <u>Upper Lake Pomo Ass'n.</u> v. <u>Watt</u>, No. C-75-0181 SW (N.D. Calif.; Partial Summary Judgment entered in May, 1979); <u>Table Bluff Band</u> v. <u>Watt</u>, 532 F. Supp. 255 (N.D. Calif., 1981), appeal on damages pending.

  At present, C.I.L.S. is litigating the damage claims of the people of the Robinson Rancheria in the Court of Claims (<u>Duncan</u> v. <u>U.S.A.</u>, <u>supra</u>), and similar claims of the people of the Upper Lake and Table Bluff Rancherias before, respectively, the Northern District of California and the Ninth Circuit Court of Appeal.

  The basic legal issues in these cases are (1) the nature and extent of the obligations of the United Staes and the rights of plaintiffs as Rancheria Indians under the trust

relationship which exists between the United States and
plaintiffs under the Rancheria Act and under the respective
Rancheria distribution plans, and (2) the nature and scope of the
relief to which plaintiffs would be entitled upon a showing that
federal defendants breached those obligations in implementing the
Rancheria Act at the rancherias represented in this action.

The essence of plaintiffs' legal claims is as follows:

1) both the trust relationship and the Rancheria Act
imposed upon the United States the legal obligation to provide
the Indians of the Rancherias subject to the Act with:

(a) sufficient accurate information upon which to
base an informed decision about whether or not to accept
termination under the Rancheria Act; and

(b) through, among other things, the promulgation
of regulations imposing standards on the provision of
improvements under the Rancheria Act that assured that all
improvements would meet applicable state and county legal
requirements, to ensure that the distribution plans prepared
under the Act -- as promulgated, approved and implemented --
fairly and adequately provided for the reasonable needs of the
people of the Rancherias for water and sanitation facilities and
other improvements, benefits and services necessary to enable
them successfully to assimilate into the surrounding non-Indian
community;

2) the disbtibution plans constituted binding contracts
under which the United States bound itself to provide adequate
water, sanitation and other improvements, benefits and services
to the people of the Rancherias in exchange for the termination

-3-

of plaintiffs' special Indian status under the trust relationship between plaintiffs and the United States, and the termination of the trust and Indian country status of the lands of the Rancherias;

3) federal defendants' breach of fiduciary, statutory and/or contractual obligations would entitle plaintiffs to relief which would include restoration of their Tribal and personal status as Indians, restoration of the Indian country status of the rancherias, the right to restore Rancheria lands to federal trust status for the benefit of persons or entities designated by plaintiff landowners, the right to participate in federal benefits, services and programs provided especially to Indians, and money damages for losses proximately caused by the premature, unauthorized or otherwise unlawful implementation of the Rancheria Act.

Plaintiffs' basic factual contentions are that federal defendants did not provide plaintiffs with sufficient accurate information upon which to base informed decisions about whether or not to accept termination; that by failing to adopt proper standards and otherwise, federal defendants failed to ensure that the distribution plans -- either as approved or as implemented -- for the Rancherias represented herein adequately provided for the reasonable needs of all of the Rancherias' people; and thus that the distributions of Rancheria assets and the concomitant termination of plaintiffs' Indians rights and status were not validly effected pursuant to, as authorized by, in accordance with or under the provisions of the Rancheria Act.

Because proceedings were deferred pending the outcome

-4-

of settlement negotiations, plaintiffs have not moved for summary judgment and defendants have not yet responded to any such motion. However, based upon defendants' answers in this case and the positions taken by federal defendants in other untermination cases, plaintiffs anticipate that were these cases to proceed further, defendants' legal contentions probably would be that except as provided in the Rancheria Act, plaintiffs lacked vested or other interests in Rancheria lands; that there has been no government-to-government relationship between plaintiff Bands and the United States; that the general trust relationship between the United States and Indians did not impose any specific obligations upon federal defendants in implementing the Rancheria Act; that the Rancheria Act vested the federal agencies involved with broad discretion in promulgating, approving and implementing distribution plans thereunder; that distribution plans were and are not binding contracts; that while a distribution of Rancheria assets which is not preceded by provision of adequate services under §3 of the Rancheria Act does not terminate the Indian status of distributees and dependents, any declaratory and/or equitable relief for violation of federal trust or statutory obligations in the course of implementing the Rancheria Act should be limited to restoring plaintiffs to their former status as Indians and enabling Indian landowners to elect to return their lands to exactly the same status as existed prior to approval of the distribution plan -- i.e., ownership by the United States without specification of a trust beneficiary; and that money damages are not recoverable against the United States for any losses which plaintiffs may have suffered by reason of the

-5-

premature or otherwise unlawful implementation of the Rancheria Act, because the United States neither has waived its immunity to suit nor has any federal statute or regulation created a cause of action for money damages cognizable under the Tucker Act, 28 U.S.C. §1346(b).

Plaintiffs anticipate that defendants' factual contentions would be that the United States provided Rancherias with sufficient accurate information upon which to base their respective decisions to accept termination; that the distribution plans adequately provided for the needs of the people of the Rancherias; that the facilities, benefits and services actually provided to the Rancherias by the United States adequately met the reasonable needs of the recipients; and that plaintiffs sustained no compensable losses by reason of the distribution of Rancheria assets.

Prior to filing motions for partial summary judgment, plaintiffs in both cases conducted extensive discovery by means of written interrogatories and deposition. Through this discovery, plaintiffs have been able to document fairly detailed histories of the Rancherias and their respective relationships with defendants up until the present. Based on this material, plaintiffs have prepared a memorandum in support of partial summary judgment on all issues except defendants' liability for money damages and various letters to the federal defendants.

Based upon this evidence, it is the opinion of the undersigned that the principal material factual assertions made in support of plaintiffs' motions for partial summary judgment are not likely to be subject to genuine dispute, and that these

facts, considered in light of the legal principles established in
the unappealed final judgments in Knight v. Kleppe, supra, Duncan
v. Andrus, supra, Daniels v. Andrus, supra, Smith v. U.S.A.,
supra, and Table Bluff Band v. Watt, supra, clearly entitle
plaintiffs to the relief which they seek herein.  However, it
also is the opinion of the undersigned that full and vigorous
dispute of plaintiffs' legal contentions and factual claims could
put at risk some of the most significant relief plaintiffs seek,
and would certainly and substantially delay the receipt of any
relief to which plaintiffs ultimately are held to be entitled.
Substantial delays in entry of judgments awarding plaintiffs
equitable relief could render the actual receipt of such relief
uncertain, because of the possibility of federal budget cuts and
policy changes.

Recognizing that a prompt settlement would be mutually
beneficial, the parties have pursued lengthy settlement
negotiations.  After extensive, painstaking negotiations and
consultations with their respective clients, counsel for the
parties agreed upon the stipulations for entry of judgment which
were filed on July 23, 1983, and which is before the court for
approval.

Under the settlement plaintiffs and the "class members"
represented by them from seventeen (17) of the thirty-four (34)
rancheris represented herein would receive the following relief:

1) Their status as Indians under the laws of the
United States is confirmed;

2) Each Rancheria is to be listed in the Federal

///

-7-

Register as an Indian Tribal entity pursuant to    C.F.R. Part
83.6(b);

3) Any plaintiff(s) or the Indian successor(s) thereof
who received fee title to an interest in a former trust allotment
by reason of the distribution of Rancheria assets will be
entitled to return said interest to trust status for the benefit
of such Indian person(s) as the grantor may specify;

4) Within two years from the date judgment is entered,
each plaintiff Band is entitled to convey its community-owned
lands to the United States to be held in trust for the benefit of
the Band or the Indians of the Rancheria, as the Band may
specify;

5) Any plaintiff(s) or Indian heir(s), devisee(s) or
successor(s) in interest thereof owning land within his/her/their
Rancheria may elect to convey said land back to the United States
to be held in trust for the Indian class member(s) or entity
specified by the grantor(s);

6) The Secretary of the Interior shall facilitate the
return of lands to trust status by providing reasonably necessary
survey, title and recording assistance;

7) The distribution plans for both Rancherias would be
of no further force and effect, and notice thereof would be
published in the Federal Register; however, there would be no
effect on vested rights created or conveyances authorized or
effected thereunder, or on the rights of subsequent bona fide
purchasers for value.

///

///

Class members from twelve (12) 1/ of the remaining seventeen rancherias represented in this action would be dismissed from this action without prejudice to their right to refile another action or other actions on their behalf. No class member from these rancherias currently owns real property within the original rancheria boundaries. The property was either sold to non-Indians when the rancheria was terminated and the proceeds of these sales distributed to rancheria members in lieu of deeds to individual parcels of property or all of the property originally distributed was subsequently sold to non-Indians.

In either case the federal defendants are unwilling to re-assume responsibility for any of these rancherias without a final judicial determination of their obligation to do so. Plaintiffs attorneys do not concede that the sale of rancheria property precludes distributees from obtaining judicial relief for wrongful termination (in some cases these class members may have the most significant damages claims). However, plaintiffs believe that these rancherias do present unique considerations and that it does not make sense to delay relief for those rancherias upon which class members still reside, while the parties litigate these other issues. Accordingly, plaintiffs attorneys believe that it serves the interests of the entire class to severe these claims from those of the seventeen

---

1.  Alexander Valley would have been the thirteenth rancheria in this category but by oversight was omitted from the stipulation for entry of judgment and notice of settlement to the class. The parties propose to file a supplemental stipulation after the Court approves the current one and to obtain approval after notice to class members from Alexander Valley.

rancherias and to dismiss those claims from ___ action without prejudice.

The other four (4) rancherias (Scotts Valley, Guideville, Graton and Auburn) were the subject of prior law suits. Plaintiffs attorneys were attorneys of record in these prior actions and the undersigned reviewed the stipulations and judgments in each of these cases prior to signing the stipulation for entry of judgment in this case. I am satisfied that those distributees from these rancherias who were parties to these prior actions and received benefits under judgments in these prior actions are precluded from further litigating the validity of the government's actions in terminating their rancherias under the California Rancheria Act. Some class members who were not parties to prior actions from Scotts Valley, Guideville and Graton rancherias will have the right under the proposed settlement in this action to file a new law suit, since their claims are dismissed without prejudice on the same terms as are the class members from the other twelve (12) rancherias. The action involving Auburn Rancheria was brought and settled as a class action and for that reason binds all distributees from that rancheria.

As to the seventeen (17) rancheria, in exchange for the prompt and certain granting of this equitable and declaratory relief without the risks, delays and ordinary uncertainties of litigation and possible appeals, plaintiffs' claims for money damages in these cases would be dismissed with prejudice and further actions arising out of the purported termination of the Rancherias would be foreclosed.

Having litigated to conclusion other major untermination cases, being presently involved in the litigation and/or appeal of the liability and damage aspects of such cases in the Court of Claims, the Court of Appeals and the district court, and having weighed the benefits of the proposed settlement against the potential risks and delays inherent in litigating this case to its conclusion, it is the opinion of the undersigned that approval of the settlement would be in the best interests of both the named plaintiffs and the class of persons represented by them. This opinion is based upon the following considerations:

1. <u>Likelihood of Recovery and Adequacy of Settlement</u>

Although it is a virtually certainty that plaintiffs would receive at least some equitable relief (if only because defendants agree that provision of adequate water and sanitation facilities under §3 of the Rancheria Act is a condition precedent to lawful termination, and the Bureau of Indian Affairs and I.H.S. both have identified numerous rancherias receiving benefits under this settlement as among those at which §3 water and sanitation facilities were not adequately completed prior to distribution of Rancheria assets, see letter from Locke, dated Feb. 1, 1982, and letter from Rapport, dated March 3, 1983 (copies of which are attached hereto as Exhibit "A"), the nature and extent of the relief to which plaintiffs would be entitled is likely to be the subject of considerable dispute. Based upon experience in other similar cases, the undersigned anticipates that defendants would be most likely to litigate to the fullest extent the nature of the <u>status quo ante</u>, and thus plaintiffs' right to have community lands returned to trust for the benefit

-11-

of specified Tribal entities, to have individual lands returned to trust status for named individual beneficiaries, and to receive B.I.A. assistance in returning lands to trust.

The undersigned believes that at least some plaintiffs and unnamed class members have sustained money damages as the direct result of wrongful termination, that such damages are susceptible to proof and that the United States should be held liable for such damages.  However, individual class members with significant damage claims will have the right to exclude themselves from the settlement by giving notice to the Court. Plaintiffs' attorneys believe this protects the rights of those class members, while benefitting those others who believe that an immediate settlement  outweighs uncertain, future damage awards. In addition to legal uncertainties, regarding liability (e.g., whether a particular rancheria was illegally terminated) some plaintiffs' claims for money damages could be subject to problems of proof and the passage of time.

In the opinion of the undersigned, the potential long-term value of the equitable relief to be granted to the Bands, individual plaintiffs and class members under the settlement stipulations in all probability will far exceed the money damages which might be recovered in these actions were they not to be settled, particularly where those who feel they have significant damages claims have the option not to participate in this settlement.

2.    <u>Avoidance of Future Litigation and Other Problems</u>

Unless this case is settled, trials may be necessary, and appeals almost certainly would follow, thus delaying receipt

of any meaningful relief for at least one, and possibly as many as three years. During that time, it is likely that some elderly plaintiffs and class members will pass away, and thus be denied the benefit of any relief eventually awarded. Additional delays will increase the tax liability of Indian landowners and the risk that lands may be lost. The transfer of interests in property by conveyance or inheritance also will be more complicated and costly. Also, during that time, plaintiffs not only would be denied access to many of the federal Indian services they desperately need, but also would run the risk that changes in federal policies might eliminate some of the services and benefits plaintiffs otherwise might have received.

In summary, the proposed settlement would immediately grant plaintiffs substantially all of the equitable relief they seek in their lawsuits, in exchange for dismissal with prejudice of damage claims which are subject to legal uncertainties and problems of proof, and may be of substantially less value over time than the equitable relief provided. Moreover, there can be no assurance that changes in federal Indian policy while this case is being litigated will not render equitable relief awarded several years from now much less valuable than that relief would be today.

/// 
/// 
/// 
/// 
/// 
///

For all of these reasons, it is the opinion of the undersigned that the settlement set forth in the Stipulation for Entry of Judgment is fair, adequate and reasonable, and thus should be approved by the court.

DATED: 11/16/83

Respectfully submitted,

DAVID J. RAPPORT
LESTER J. MARSTON
CALIFORNIA INDIAN LEGAL SERVICES
Counsel for Plaintiffs

By: _____
DAVID J. RAPPORT

-14-



*United States Attorney*
*Northern District of California*

Refer to:
 Land and Natural
 .Resources Division
   #2073

*16th Floor Federal Buiding· Box 36055*        *Branch Office:*
*450 Golden Gate Avenue*             *675 N. First Street, Suite 508*
*San Francisco, California 94102*        *San Jose, California 95112*

February 1, 1982

Mr. David J. Rapport, Esq.
CALIFORNIA INDIAN LEGAL SERVICES
200 West Henry Street
P. O. Box 488
Ukiah, California  95482

Dear Mr. Rapport:

      Re:  Tillie Hardwick, et al. v. U. S., et al.
           Civil No. C-79-1710 SW (N. D. Calif.)

      Pursuant to our conversations and meeting of January 18,
1982, the Government is willing to discuss settlement of the follow-
ing rancherias:

            Chicken Ranch                 Potter Valley -
            Cloverdale                    Redwood Valley -
            Greenville ?                  Rohnerville ?
            Mooretown ?                   Smith River -
            Picayune -

      We also invite your arguments in support of any additional
rancherias that you believe should be included in settlement discus-
sions with those listed above.

      In addition, there are several other rancherias listed in
the ·Complaint which are the subject of litigation in other proceedings.
We believe that disposition of this classification of rancherias should
also be discussed in our settlement conference.

                        Very truly yours,

                        JOSEPH P. RUSSONIELLO
                        United States Attorney

            By:

                        PAUL E. LOCKE
                        Assistant United States Attorney

PEL:nam
cc:  William M. Wirtz, Assistant Regional Solicitor, Department of
         the Interior, Sacramento, CA
     Duke McCloud, Attorney, Department of Health & Human Services,
         Rockville, MD        EXHIBIT "A"

**EXHIBIT C**

FILED

DEC 15 1983

WILLIAM L. WHITTAKER
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

*98*

TILLE HARDWICK, et al.,          )
                                 )
                 Plaintiffs,     )    No. C-79-1710-SW
                                 )
                                 )    FINDINGS AND
        vs.                      )    RECOMMENDATION
                                 )
UNITED STATES OF AMERICA,        )
et al.,                          )
                                 )
                 Defendants.     )
                                 )

        This matter came on for hearing on December 14, 1983,
for a recommendation as to whether the district court
should approve the terms of a class action settlement
agreement and enter a stipulated judgment against the
United States.  David Rapport and George Foreman appeared
on behalf of the plaintiffs;  Paul Locke appeared for the
defendant United States.

        This is a class action lawsuit to set aside the
termination of thirty-four California Indian Rancherias
under the California Rancheria Act (the Act) and to recover
damages for alleged violations of the Act and the federal

government's obligations as trustee.  On  gust 2, 1983,

the plaintiffs and the federal defendant filed a written

agreement compromising and settling certain claims of

the Indians against the United States.

Briefly, the settlement affects seventeen of the

thirty-four rancherias.  Under the terms of the proposed

stipulated judgment, Indian class members from the seventeen

affected rancherias would:

(1) have restored their individual status as Indians

under federal law;

(2) have restored their status as federally recognized

Indian Tribes, Bands, Communities or groups;

(3) have the right to convey to the United States

property they received when the rancherias were terminated,

to be held in trust for the benefit of the current owner

or owners or such other rancheria member as the owner or

owners shall designate;

(4) dismiss with prejudice claims for damages against

the United States.

Within two years of the judgment, the Indian Tribes,

Bands, Communities or groups of the seventeen affected

rancherias would have the right to convey to the United

States community-owned lands within the rancherias, to be

held in trust for the benefit of  the conveying Tribe,

Band, Community or group.

Class members from twelve other rancherias would

FINDINGS AND
RECOMMENDATION

-2-

1   dismiss without prejudice their claims.    Class members from

2   the five remaining rancherias, who settled their claims

3   against the United States in prior actions, would dismiss

4   with prejudice their actions.

5       On October 21, 1983, the district court approved the

6   notice to class members advising class members that they

7   could opt out of the class or submit written objections

8   to the proposed settlement on or before November 21, 1983.

9   The notice also advised class members of the December 14,

10  1983 hearing at which they could appear.

11      Approximately 40 class members appeared for the

12  December 14, 1983 hearing.  After David Rapport described

13  the terms of the settlement, the court afforded each class

14  member the opportunity to speak in support of or opposition

15  to the proposed settlement.

16      Six class members spoke:  Silvia (Green) White, William

17  Richards, Bertha Stewart, Jane Brown, Ed Sanderson and

18  Frank Hossler.  Four of them -- Ms. White, Ms. Stewart and

19  Mr. Richards of the Smith River Rancheria, and Ed Sanderson

20  of the Quartz Valley Rancheria -- favor trust status and

21  support the settlement, although Ms. White and Ms. Stewart

22  believe that additional land should be included in the

23  settlement.  Ms. White specifically objected to the exclusion

24  of two parcels used as a parsonage and church on the Smith

25  River Rancheria.  See generally White's Exhibit 1.

26      Ms. Brown of the Wilton Rancheria terminated her

FINDINGS AND
RECOMMENDATION
                            -3-

statement when she was informed that Wilt _ is not included in the proposed settlement. Mr. Hossler of the Smith River Rancheria was the only class member who did not endorse the overall settlement and he simply requested an additional thirty days to study the terms of the agreement.

Based on the materials presented to the court, having heard the arguments of counsel and the statements of the class plaintiffs, the undersigned recommends that the settlement agreement be approved by the district court and that judgment be entered in accordance with the stipulated judgment filed by the parties on August 2, 1983.

DATED: December 15, 1983

JOAN S. BRENNAN
United States Magistrate

FINDINGS AND
RECOMMENDATION

-4-

**EXHIBIT D**

**Lands Within The Original Boundaries**
**Of The Wilton Miwok Rancheria Presently Owned By**
**Distributees, Dependant Members, Their Heirs or Legatees**

| Parcel | Distributee | Owner As Of 7/1/1983 (*Tillie Hardwick* Settlement) | Indian Owner At Restoration | Owner As Of 11/1/2006 | Current Indian Owners |
|---|---|---|---|---|---|
| Lot 1 126-0230-010 | Jane D. Brown | Jane D. Brown | Yes | Jane D. Brown | Yes |
| Lot 2 126-0220-004 | Archie G. Williams | Jan C. Springer and Velma M. Springer his wife as Joint Tenants | No | Norman H. Orrick and Marilyn D. Orrick | No |
| Lot 3 126-0230-005 | Eva Irish | Theodore H. Bergala | Yes | Michael Steel and Susan Steele, husband and wife as Joint Tenants | No |
| Lot 4 126-0230-006 | Dorothy Andrews | Melvin and Barbara Wormington | No | Cindy Ann Chafin, Unmarried Woman | No |
| Lot 5 126-0230-009 | Ella and Arthur Taylor | Eddie Taylor and Ronda Benson [Taylor] | Yes | Edward Taylor, Ronda Benson, Delores Hernandez, Andrea Vera, and Robert Benson | Yes |
| Lot 6 126-0220-003 | Annie McKean | Charles J. McKean, Jr | Yes | Myrna McKean | No |
| Lot 7 126-0220-002 | John McKean | Bertha E. McKean | Yes | Stephen Alan Major, an unmarried man, and Laura Ann Shembery, an unmarried woman as joint tenants | Yes |
| Lot 8 126-0230-007 | Ada Louise Madrigal | Dorothy Andrews | Yes | Dorothy Andrews | Yes |
| Lot 9 126-0230-008 | Cosumnes River Indian Association | Cosumnes River Indian Association | Yes | Cosumnes River Indian Association | Yes |
| Lot 10 126-0230-004 | Gertrude Dupree | Gertrude Dupree | Yes | Patricia Baker and James Baker | Yes |
| Lot 11 126-0230-003 | Charles J. McKean Jr. | Charles J. McKean Jr. | Yes | William Daniels, Clifford McKean, James Daniels | Yes |
| Lot 12 126-0230-002 | Virginia Hatch | Herman and Constance Tripp | Yes | Maureen C. Franklin | No |
| Lot 13 126-0230-001 | Consumnes River Indian Association | Consumnes River Indian Association | Yes | Maureen C. Franklin | No |
| Lot 14* 126-0220-001 | Charles McKean, Jr. | Charles J. McKean, Jr. | Yes | Clifford H. McKean | Yes |

*Although the Distribution List provides for 13 Lots, the Distribution Map provides for 14 Lots.